525 So.2d 1289 (1988)
MISSISSIPPI STATE BAR ASSOCIATION
v.
Edward B. MOYO.
No. CM-210.
Supreme Court of Mississippi.
April 6, 1988.
As Clarified on Denial of Rehearing June 3, 1988.
*1290 Michael B. Martz, Jackson, for appellant.
Jack H. Young, Jr., Sorie S. Tarrawally, Jackson, for appellee.
EN BANC.
HAWKINS, Presiding Justice, for the Court:
The Mississippi State Bar has appealed from a judgment of the Complaints Tribunal imposing a public reprimand upon Edward B. Moyo. Because Moyo seriously breached his professional duties to his client, and engaged in deceit, dishonesty and fraud, we direct he be permanently disbarred.

FACTS
The record in this case does not show the precise age of Anthony J. Morris. Indeed, we do not know his full correct name. In some places it is Anthony J. Morris, at others Anthony Morris, Jr., at others Anthony Morris. We know nothing about his natural father.
On or about January 3, 1985, Anthony was living with his mother Mary A. McLaurin (at other places Mary Alice McLaurin) at 225 Elm Street in Jackson. He was probably at that time around 14 years old. On that date there was a motor vehicle accident at the corner of Bailey and Maple Avenues involving a truck being driven by William McCall and owned by Jackson Ready-Mix Concrete Company, and a car being driven by Juanita Bradshaw. Anthony, a pedestrian at the time, was struck and injured. The record tells us nothing about how the accident occurred. The record as to his injuries is ambiguous, the chancery court petition to settle his claim alleging he "received injury to his left leg and endured mental anguish," and Moyo testifying at the disciplinary hearing the boy had a "fracture of the neck."
The medical statements in this record indicate an ambulance was called on January 3, that Anthony was admitted to University Hospital on that date, and discharged on January 7. His hospital bill was $4,329.42. He had a bill from University Orthopedic Clinic for $415.00, a $260.00 bill for anesthesia, and a $277.00 bill from the Pediatric Clinic. The ambulance charge was $45.00. His total expenses shown by the record are $5,326.42.
At this time Moyo had a law office at the corner of Bailey Avenue and Elm Street, across the street and a few doors from McLaurin's home. He heard that Anthony had been injured, and had recently been released from the hospital. In Moyo's words:
A. Okay. Ms. McLaurin  at that time my office was on Bailey Avenue and Elm Street, and Ms. McLaurin's house was right across the street from my office, and I used to park my car in front of their house, opposite their house. And one day a gentleman, as I parked my car across the street, said, "The lady who lives over there's husband recently died, and the son was hit by a car and was injured, and she's looking for some help." And then the following day I was going to my car, and I saw Ms. McLaurin. I told her somebody had asked me to come to her house and see if I could help her.
(R. 103-104)
Also from the record:
Q. And you were going to go over there to help her out with regard to her son's personal injury case. Is that correct?
A. Like someone refers you to a client and you just go and investigate.
Moyo testified that he was under the impression the unidentified man who in formed him about McLaurin was her father, *1291 which he subsequently learned was a mistake. If he thought the man was her father, it is unusual that he did not tell McLaurin when he first approached her that her father had asked him to talk to her.
In any event, Moyo began working on the case. Juanita Bradshaw had a liability policy with Nationwide Insurance Company, Jackson Ready-Mix with Home Insurance Company. After correspondence, telephone calls and an interview with an adjustor, Nationwide's claims department agreed to pay $12,500 towards a compromise settlement, and Home's claims department agreed to pay $10,000.
On March 22, 1985, McLaurin, as the natural mother, next friend and "guardian" of Anthony, executed an ex parte petition to settle Anthony's claims for $22,500. The petition to settle and order authorizing settlement were prepared by Moyo.
The petition was filed on the same date in the chancery court of the First Judicial District of Hinds County. McLaurin alleged she was the natural mother of Anthony, that he was a resident of the First Judicial District of Hinds County, and the court had jurisdiction of the case pursuant to Miss. Code Ann. § 93-13-211, and "all necessary interested parties are joined herein."
Paragraph 2 alleged that Anthony had "sustained certain personal injuries and mental anguish" as a result of the January 3 accident, and further that he had "received injury to his left leg and endured mental anguish," and incurred approximately $5,300 medical expenses as a result.
Paragraph 3 alleged that the accident was due to the negligence of Jackson Ready-Mix and Bradshaw, and a $22,500 offer of settlement had been made as authorized by Miss. Code Ann. § 93-13-211, to completely settle the claim against all persons. Paragraph 4 alleged that the claim was doubtful, unliquidated and disputed, and that it was to the best interest of Anthony to accept the offer.
Paragraph 5 alleged that Moyo's services had been engaged, that he had conducted a thorough investigation, had rendered good and valuable services, and that the "petitioners herein should be authorized to pay their said attorney the total sum of $9,000.00 out of the settlement proceeds herein, as a reasonable attorney fee."
The prayer asked the court to hear and investigate the matter, determine what was in the best interest of the minor, and to enter an order authorizing settlement and a release of all claims, and that the "Petitioners be authorized and empowered to receive such sum of money for the use and benefit of the minor petitioner ..." The petitioner asked for special and general relief.
Also on this same date Moyo alone presented the petition to a Hinds County chancellor in his chambers, and an order was entered that same date in essentially the same words as the petition, authorizing the settlement and $9,000 payment to Moyo, which the court found was a "reasonable fee" for his services.
Moyo testified that the reason he did not set up a guardianship was that he was mistaken as to the law, thinking the estate must have at least $10,000 for a guardianship.
There is a difference between Moyo's and McLaurin's testimony as to his employment, as well as the disbursement of the settlement proceeds.
Moyo testified he received the $10,000 settlement check first, out of which he paid himself $9,000 and gave McLaurin $1,000 in cash. When he received the $12,500 check he said he gave her a check for $4,500 and paid her $5,300 in cash with which to pay the medical bills. This left $2,700 remaining of the $12,500 payment.
About this time McLaurin was arrested for cashing retirement checks payable to her deceased husband. She called Moyo to represent her. With the remaining $2,700 he charged her $2,500 for his fee, and took the $200 for a bondsman's fee.
The record is not clear, but apparently by paying the businesses the amount of the checks on which she had forged the endorsements, McLaurin was released from *1292 the criminal charges. This unknown amount was apparently paid by Moyo.
On March 28 McLaurin deposited the $4,500 check in a silver savings account with the First National Bank in Jackson. There promptly began a series of disbursements. McLaurin bought a bicycle and a television set for Anthony, and "stuff that he wanted to have and things." She also let her retired father have money. By June 24 the account was down to $1,587.11.
At some point in time after he had let McLaurin have the $4,500 check, Moyo found himself in need of some money. He approached McLaurin for a loan of $1,500, promising to repay the $1,500 plus an additional $500 in thirty to forty-five days.
Apparently the two of them went to the bank. There, instead of McLaurin simply withdrawing the money and loaning it to Moyo, the bank loaned him $1,500 and used $1,500 of the savings account as collateral.
When McLaurin's disbursements got down close to the $1,500 balance, the bank would not permit further withdrawals.
Friends advised McLaurin she had not been done right. Enter the Mississippi State Bar. McLaurin complained to the Bar and an investigation ensued, Moyo being notified of its pendency. On July 1, 1985, Moyo paid McLaurin $200, on July 5 he paid her $110, and on July 18 he paid her $200. On July 19, 1985, the date of the Bar's investigatory hearing, Moyo paid the bank $1,519.25 in repayment of the loan.

McLAURIN'S VERSION
McLaurin's answers calling for a "yes" or "no" were answered with a "Uh-huh," or a "Unh-huh."
She did not know Moyo before the accident. When he came to her, she testified: "Well, he come over there and said that he was sent over there to ask me how my son got hurt and what happened to him." She said there was no discussion as to how Moyo was to be paid.[1] She gave Moyo the ambulance bill.
The next thing she heard from Moyo was about a month later when he came to her and gave her $500 in cash. She thought her son was in the hospital about a month.
She said Moyo took her to the bank and gave her the $500 in cash after he had signed her name to the back of a check. None of the $500 was used to pay medical bills.
She said that the next time she was in contact with Moyo was when she was put in jail and had her stepmother call him. She said she "guessed" he got $2,000 then to represent her. She further testified that when she got out of jail he gave her another $500 in cash, telling her this was what was left out of what he had paid to get her out of jail.
She knew nothing about any settlement Moyo had made with the insurance companies. Moyo told her that he would pay the medical bills.
In addition to the two $500 disbursements, McLaurin said she received $4,500 which she took to the bank. This was all that Moyo paid her until the summer of 1986, and long after the disciplinary proceedings had been instituted. In May or June, 1986, she said Moyo paid her $2,000. As to the $2,000, she said that Moyo told her this was to pay the medical bills. According to McLaurin, at the time of the hearing in October, 1986, Moyo had paid her a total of $7,500. She said that she had met with Moyo after she had made her complaint and that he promised to "relief the money back to me."[2] At the hearing there was $578 remaining on deposit in the savings account.
Despite her testimony on cross-examination, McLaurin testified she did not believe Moyo had tried to trick her, and that she had been "rushed," or "pushed" into making a complaint.
*1293 Appended as Exhibit A to his May 14, 1986, answer to the amended formal complaint of the bar, Moyo had the following instrument:

 Account for Anthony
 Morris
 Gross proceeds of Settlement $22,500.00
 Attorney Fees 9,000.00
 Net proceeds to Client,
 Check and Cash $13,500.00

 Signed: /s/Mary Alice McLaurin
 Signed: /s/E.B. Moyo
McLaurin testified that Moyo gave her this document to sign when she was at the jail.
At the conclusion of its hearing, the complaint tribunal entered its findings of fact and conclusions of law. The tribunal was of the opinion the Bar had failed to prove by clear and convincing evidence that Moyo had solicited this case in violation of the professional code. It was of the opinion that he had failed to properly account for funds coming into his hands in violation of DR 5-104(A), and DR 9-102(B)(1, 3 and 4) of the Disciplinary Rules, had improperly borrowed $1,500 of the minor's funds in violation of DR 5-104(A), and converted $2,700 of the minor's money to pay himself a fee to represent McLaurin and pay the $200 bond fee.
The tribunal's judgment was that Moyo receive a public reprimand. The Bar has appealed.

LAW
A fundamental purpose and major reason for the existence of a chancery court is to fulfill society's function of protecting children. It is part of nature for each species to protect its young, yet even in biology one thing that removes man most from the other mammals is the long-term care and nurture we give the young and helpless. From ancient times our solicitude and concern for children has been steeped in Anglo-Saxon law. Pomeroy's Equity Jurisprudence, Vol. III, Ch. 10, §§ 1303-1305. It is imbedded in our faith. Matthew 9:18; Mark 10:16; Luke 17:2; I Kings 17:10-23; Genesis 37:35; Psalm 113:9 and 132:12. Indeed, the highest compliment we pay ourselves is in calling the human race "children of God," thus solemnly suggesting we are the pride and joy of the Maker of the universe.
Justice Griffith, this State's most profound exponent of chancery court jurisdiction in this century, speaking for the Court in Union Chevrolet Co. v. Arrington, 162 Miss. 816, 138 So. 593, 595 (1932), stated:
Infants and persons of unsound mind are disabled under the law to act for themselves. Long ago it became the established rule for the court of chancery to act as the superior guardian for all persons under such disability. This inherent and traditional power and protective duty is made complete and irrefragable by the provisions of our present state constitution. It is not competent for the Legislature to abate the said powers and duties or for the said court to omit or neglect them. It is the inescapable duty of the said court and of the chancellor to act with constant care and solicitude towards the preservation and protection of the rights of infants and persons non compos mentis. The court will take nothing as confessed against them; will make for them every valuable election; will rescue them from faithless guardians, designing strangers, and even from unnatural parents, and in general will and must take all necessary steps to conserve and protect the best interest of these wards of the court. The court will not and cannot permit the rights of an infant to be prejudiced by any waiver, or omission or neglect or design of a guardian, or of any other person, so far as within the power of the court to prevent or correct. Grif.Chan.Prac. §§ 45, 360, 530, 533. All persons who deal with guardians or with courts in respect to the rights of infants are charged with the knowledge of the above principles, and act to the contrary thereof at their peril.
See also: Wansley v. Schmidt, 186 So.2d 462, 465 (Miss. 1966) (chancery court has "duty" to "protect and promote the best interests of minor children").
The Legislature has created three statutory methods whereby a chancery court *1294 may bind a minor (not otherwise emancipated under statutory law) as to any property or claims which he may have to the same extent as an adult.
Miss. Code Ann. §§ 93-19-1  9 authorize chancery courts to remove disabilities of minority partially or generally. The proceeding must be filed by a next friend and both parents, if living, joined as party defendants. Miss. Code Ann. § 93-19-3 (1972). The proceeding may be ex parte if both parents unite with the minor and his next friend in the petition. Miss. Code Ann. § 93-19-5 (1972). In hearing the matter the court is required to make "such decree thereon as may be for the best interest of the minor." (Miss. Code Ann. § 93-19-7 (1972).
Also, there is a chapter on legal guardians of minors. Miss. Code Ann. Chapter 13, §§ 93-13-1  79. Within that chapter, Miss. Code Ann. § 93-13-59 authorizes a duly appointed legal guardian to compromise doubtful claims, the same as an executor or administrator under Miss. Code Ann. § 91-7-229 is authorized to settle claims.
Finally, and also in Chapter 13, Miss. Code Ann. § 93-13-211 authorizes the chancery court to settle a small claim of a minor without necessity of a guardianship.
Legal guardianships have, of course, been a part of equitable jurisdiction since we have been a state. Hutchinson's Code, 1848, Chapter 36, Article I (125).
Removal of the disability of minority likewise has a long history, antedating §§ 353 through 355 of the 1930 Code, as has settlement of doubtful claims by a guardian, §§ 1710 and 1886, Code 1930.
Finally, § 1911 of the 1930 Code also authorized a small sum of money, not exceeding $300, to be delivered to a minor or some person for him, without necessity of a guardianship. This sum was increased by subsequent legislative enactments to $500, $1,000 and by Chapter 408, § 19, Laws of 1972 (codified as Miss. Code Ann. § 93-13-211) to $2,000. We quote the pertinent portions of this section under which Moyo filed his petition:
§ 93-13-211. Money or personal property not exceeding one thousand dollars.
When a minor, ... shall be entitled under a judgment or order or decree of any court, or from any other source, to a sum of money not greater than two thousand dollars ($2,000.00), ... the chancery court of the county of the residence of such minor, ... may order such money or property to be delivered to the minor, ... or to some other person for him if he has no guardian, and compliance with such order shall acquit the person so delivering the same. Provided, however, that if said sum of money or personal property is not due said minor, ... under a judgment or order or decree of a court, then in that event the chancery court before ordering said money or personal property paid over or delivered as above provided shall fully investigate said matter and shall satisfy itself by evidence, or otherwise, that the proposed sum of money to be paid, either as liquidated or unliquidated damages because of any claim of said minor whatsoever whether arising ex delicto or ex contractu, is a fair settlement of the claim of said minor, and that it is to the best interest of said minor that said settlement be made, or that said personal property be delivered to said minor. Thereupon said chancery court may authorize and decree that said sum of money ... be accepted by said minor and paid or delivered by the party owing or having the same as authorized by the decree of the court, and compliance with such order in the latter event shall acquit the person so paying or delivering the same. He, who under such order shall receive the money or property of a person under such disability, shall thereby become amenable to the court for the disposition of it for the use and benefit of the person under disability but shall not be required to furnish security therefor unless the chancery court shall so *1295 order. [Emphasis added][3]
By Chapter 387, Laws of 1986, effective March 24, 1986, the maximum sum which could be paid a minor in settlement without a guardianship was increased to $10,000.
While these sections set forth the bare technical essentials in filing and proceeding in matters involving minors, they by no means encompass the extent of the duty and responsibility of a chancery court in dealing with a minor's claim.
In Union Chevrolet Co. v. Arrington, supra, a widow, as legal guardian, had secured chancery court authority to settle the claims for her seven minor children over the death of their father in a motor vehicle accident. The settlement was obtained under §§ 1710 and and 1886 of the 1930 Code (essentially our Miss. Code Ann. §§ 93-13-59 and 91-7-229). When the guardian's petition for settlement was presented to the chancellor, only the attorney for the defendant and the driver of the defendant's truck appeared. The decree authorizing the settlement recited all jurisdictional requirements, including the specific finding that the outcome of the cause of action was doubtful.
A year later the widow filed a bill in chancery to set aside the settlement. The chancery court held that the original settlement was not binding on the minors. In affirming, this Court held that the two 1930 Code sections should be reviewed in connection with the original principles of equity jurisdiction in which they were embedded.
And, finally:
The two sections of our statutes authorizing the settlement of claims are imbedded [sic] in those principles [enunciated in the above quote] and are inseparable therefrom, both in meaning and in administration. To make a compromise settlement by a guardian effective against their wards in any case the judicial sanction thereof must be upon a real and not a perfunctory or merely formal hearing Simmons v. Simmons, 85 W. Va. 25, 100 S.E. 743. For equal reason, the chancellor is not authorized to conduct a hearing and enter a decree wherein no witness in behalf of the wards is heard, or where the only witness is one who in the very nature of things is adverse to them. These sections contemplate and require that the chancellor in acting thereunder shall not proceed unless the interests of the infants are actually represented and protected at the hearing. To hear only the witness or witnesses who are adverse to the minors would be equivalent to taking a default against them  indeed, it would be equivalent in legal effect to a refusal to hear the witnesses in their behalf. And while it is permissible for an attorney to represent both sides in presenting such a petition, provided he fully advise the chancellor thereof, he must in so doing see it that the testimony and the witness or witnesses who will give the full facts in behalf of the minors are presented and are heard, and if this is not done then there is a fundamental omission which amounts to legal fraud, however free from any thought of wrong the attorney may have been throughout... .
138 So. 595-596.
Our holding in Union Chevrolet is just as strong today as when Justice Griffith made the eloquent pronouncement for this Court over a half century ago. It has lost none of its vitality. When a chancery court deals with minor's affairs, not just the letter, but the spirit of the law must be carried out. A proceeding which meets all technical statutory requirements may still fail if the minor's interests were not in fact protected. Indeed, the letter  all technical requirements of the statute  must be completely met, and chancery's inherent obligations to children must be fulfilled. See: Baker by Williams v. Williams, 503 So.2d 249, 259 (Miss. 1987) (Griffin, J., dissenting); Joyce v. Brown, 304 So.2d 634 (Miss. 1974); Jones Estate v. Culley, 242 Miss. 822, 134 So.2d 723 (1961); Wheeler v. Shoemake, *1296 213 Miss. 374, 57 So.2d 267, 286 (1952); McCullum v. Gavin, 206 Miss. 151, 39 So.2d 859, 860 (1949); Dewitt v. Thompson, 192 Miss. 615, 7 So.2d 529, 531 (1942); Reily v. Crymes, 176 Miss. 133, 168 So. 267, 269 (1936); Henry v. Baker, 174 Miss. 676, 165 So. 444, 445 (1936).
In our jurisprudence the chancery court sits as the superior, overriding guardian of minors' affairs placed before it, with the responsibility in each case of making an actual first-hand inquiry into the facts, from which it determines the best interest of the minors, before any binding order affecting them may be entered. Any statute which decreased this solemn obligation would violate our constitution.
Moyo's solicitation of McLaurin was as blatant as any door-to-door salesman. Unfortunately for Anthony, the service his mother got for him had about the same quality as the product of a vacuum cleaner or health and accident insurance salesman no more than two steps ahead of the sheriff. For Anthony, however, the loss is much greater.
It is first glaringly clear that Union Chevrolet was ignored by the chancellor. No witness appeared to inform the court anything about the accident. No doctor appeared to tell the court anything about Anthony's injuries, or his prognosis. How badly was he hurt? Would he get well? Would he remain permanently injured? Anthony was not there. His mother was not there. Only Moyo was there with the chancellor in his chambers. What first-hand proof did the chancellor have that the claim was doubtful? That the amount of the settlement was fair and in the best interests of Anthony? None.
Beyond this was the monstrous fee gouging. A settlement made less than three months after the accident, with no suit having been filed, and a fee of $9,000 out of net proceeds of approximately $17,100 is so shattering a revelation that no sufficiently opprobrious adjective readily comes to mind.
This would be the case if all technical requirements of the statutes had been met. The story does not end here, however.
Miss. Code Ann. § 93-13-211 states nothing about who should file a petition for settlement of a claim thereunder. Our law is that a petition on behalf of a minor should be brought by an adult next friend. Miss.R.Civ.P. Rule 17(c): "If an infant or incompetent person does not have a duly appointed representative, he may sue by his next friend." See also, Miss. Code Ann. § 11-53-45 (1972); Ruiz v. Ruiz, 233 Miss. 192, 101 So.2d 533 (1958); Prudential Ins. Co. v. Gleason, 185 Miss. 243, 187 So. 229 (1939). Indeed, to remove disabilities of minority, the statutes require that the petition be brought by an adult next friend, Miss. Code Ann. §§ 93-19-3  5 (1972). Far more basic, however, when there is no legal guardian, is the necessity that both parents are absolutely essential parties to such a proceeding, either as petitioners or as defendants, unless one of them has the complete custody and this fact is made clear in the petition and order. It is abhorrent to suggest that one parent should be able on his or her own, without the other's knowledge or consent, to file a petition and seek relief from a chancery court in a matter as serious as this. It may very well be that Anthony's natural father was dead, or his sole custody had been given to his mother, or some other reason his father could not or need not have been made a party. If this were the case, the petition should have positively alleged why only the mother was a petitioner. The petition makes no mention whatever of Anthony's father. In fact, the petition does not even state Anthony's date of birth.
Also blatant is the fact that the chancery court had no statutory authority to settle this claim under Miss. Code Ann. § 93-13-211. To comply with the statutes, the petition had to be filed under Miss. Code Ann. § 93-13-59 by a duly appointed and acting legal guardian. Even under the 1986 amendment to Miss. Code Ann. § 93-13-211, the maximum settlement without absolute necessity of a guardianship is $10,000. This settlement was for $22,500. The sum of "Ten Thousand Dollars ($10,000.00)" as it appears in Miss. Code Ann. § 93-13-211 (Supp. 1987) refers *1297 to the gross amount of the settlement of a minor's claim, not the net amount.
In sum, under our case law the proceeding was voidable and under our statutes an absolute nullity.
Finally, by the chancellor's order he turned over Anthony's money to a person who did not even appear in his court, and who he very well may have never seen.

ANTHONY'S MONEY
McLaurin tells an entirely different story from Moyo as to the settlement proceeds. Moyo's version first.
Moyo said he paid himself $9,000 out of the first $10,000, and paid McLaurin $1,000 in cash. Why didn't he write her a check for the $1,000? For a lawyer to deal with his client in this manner creates great suspicion, even disbelief. Moyo was dealing with a simple, ignorant woman, and all transactions should have been by checks showing precisely how the money was spent. As it is, he can claim he is right, and this simple woman mistaken in the amount she claimed to have received.
Paying in cash suggests conversion for the same reason that commingling of funds does. When a lawyer puts a client's money into his personal account, he can always say that any check he wrote for his personal benefit came from his money in the account, not the client's, and there is no way to actually prove otherwise. Because of this, it is an unethical practice of the most serious order for a lawyer even to mix his client's funds in with his own or, conversely, to use a trust account for personal as well as his clients' transactions.
Likewise, as here, by paying the client in cash, the lawyer can allege he paid the money, and it is the client's word against his that he did not. When money comes into a lawyer's hands, part of which is his fee and part of which belongs to the client, it is sleazy and reprehensible for the lawyer to pay the client his part in cash.
Next, Moyo received the $12,500 check. He unquestionably paid McLaurin $4,500 by check, but what about the rest? He claims he gave her $5,300, cash again, to pay the medical bills. Why didn't he pay them by check? If he in fact paid her the $5,300 in cash, $2,700 remained to be disbursed. Why wasn't that disbursed at the same time he gave her the $5,300? Apparently he kept the $2,700, which he had on hand when she got in jail. He then decided he was entitled to $2,500 of Anthony's money as a fee for representing her, which he kept. He paid her bondsman the remaining $200 of Anthony's money.
The explanation Moyo gave for paying McLaurin in cash is insulting to any tribunal's intelligence. He said she did not want any money to be of record, because that would deprive her of social security or welfare benefits. Yet, as to the one disbursement she was to keep, he wrote a check. The $5,300 was to be spent paying medical bills. The other $2,500 went to him as a fee.
Not satisfied with the fleecing he had already given this child, Moyo decided he needed another $1,500 of Anthony's money. By sheer luck, this transaction benefited Anthony, however, because the bank chose to make the loan. After all, with $1,500 of the savings account as collateral, there was no risk to the bank in making Moyo the loan. After Moyo got word of the complaint to the Bar, he repaid the bank.
In this manner, at least there was a little more delay in McLaurin's spending her son's money.
What, then, do we have from Moyo's own story? Alleged "cash" disbursements that no rational person can believe, and an admitted conversion of Anthony's funds which he had withheld to pay himself a fee which he considered he deserved for representing McLaurin on criminal charges subsequently dismissed. Apparently the charges were dropped when Moyo repaid the defrauded businesses with Anthony's money.
What did this child get out of all this?
It is shocking that a poor, simple, ignorant woman as McLaurin, who was confused on some simple facts is yet more credible than Moyo, a member of the bar of this State, as to the disbursements. She *1298 testified she only got $500 cash one time, another $500 when she got out of jail, and the next time $4,500. She said Moyo promised to pay the medical bills. This is far more likely, because in the summer of 1986 he gave her a check for $2,000, which if his version of the facts were true, he did not owe. According to his testimony, and that statement he had her sign when she got out of jail, she had long since been paid all she was supposed to receive according to the chancery court order. Also, he promised to pay her another $500, which he had not got around to fulfilling at the time of the hearing in October, 1986.
This Court is convinced by the weight of the evidence in this case that Moyo in fact did not pay McLaurin the $5,300 in cash as he claimed, but kept it. Aside from this, from Moyo's own testimony he converted $2,500 of Anthony's money to pay himself a fee, and attempted to get another $1,500 on an unsecured loan.
What did Moyo do wrong?
1. He solicited this case in violation of DR 2-103(A), Disciplinary Rules, Code of Professional Responsibility of the Mississippi State Bar.[4] This is a pervasive, iniquitous practice, but disciplinary proceedings for its breach are, regrettably, extremely rare. Of course, a contract entered into between an attorney and a client as a result of the attorney's solicitation is against public policy, and no doubt would be declared void by a court of law. Unfortunately, contracts resulting from solicitation by attorneys do not come to the court's attention unless the attorney has violated some other obligation to his client as happened here.[5] The client is invariably unaware that the attorney's solicitation of the employment is a serious breach of professional ethics. For this violation alone, as a first offense, Moyo should receive a public reprimand.
2. He asked for and secured an unconscionable fee for his services in violation of DR 2-106(A)(B).[6] It is no defense to Moyo that one chancellor allowed this. The Bar made no formal charge against Moyo for this outrageous fee, no doubt under the assumption that because a court allowed it, the Mississippi State Bar could not inquire behind it. We nevertheless consider it in weighing the gravity of Moyo's other misconduct.
3. He kept no records of his disbursements with the exception of one $4,500 check, preferring to disburse all the rest in cash in violation of DR 9-102(A)(B).[7]
4. He converted $2,500 of Anthony's money, which he held in his custody, to his own use to pay himself a fee he set for himself to represent McLaurin on a criminal charge. Aside from the unlawful conversion, there is no record whatever as to its reasonableness, in violation of DR 1-102(A)(3, 4 and 6).[8] Moyo alone decided that.
5. He converted $5,300 which should have been used to pay medical bills to his own use, also in violation of the same Rule. He later paid McLaurin $2,000 of this.
6. He attempted to get another $1,500 of Anthony's money from McLaurin on an unsecured personal loan, in violation of the same Rule.
7. He made no effort whatever to counsel McLaurin, obviously a hopelessly incompetent person to handle her son's money, as to her duties regarding Anthony's money.
We have searched this record in vain to find an instance where some adult attempted *1299 to consider this boy's future. In this case, everybody had a big party on Anthony's money but him.
This was perhaps the one chance for Anthony to escape from the poverty of a Jackson, Mississippi, ghetto. It is now gone.
Anthony has been ill-served. It is a lamentable fact that he would have been as well off had there been no court proceeding to settle his claim.
We therefore conclude that Moyo, while acting in a representative and fiduciary capacity which he had solicited, deliberately cheated and defrauded his minor client, which conduct was a clear and convincing violation of DR 1-102(A)(3, 4 and 6), for which he should be permanently disbarred.
It will therefore be the judgment of this Court that Moyo be permanently disbarred from the practice of law in this State.
COMPLAINT TRIBUNAL'S FINDING FOR DISCIPLINARY ACTION AFFIRMED, COMPLAINT TRIBUNAL'S ORDER FOR PUBLIC REPRIMAND REVERSED, AND APPEAL FOR PERMANENT DISBARMENT SUSTAINED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.

APPENDIX

DR 1-102 Misconduct.
[A] A lawyer shall not:
* * * * * *
[3] Engage in illegal conduct involving moral turpitude.
[4] Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
* * * * * *
[6] Engage in any other conduct that adversely reflects on his fitness to practice law.
* * * * * *

DR 2-103 Recommendation of Profession Employment.
[A] A lawyer shall not, except as authorized in DR 2-101, recommend employment as a private practitioner, of himself, his partner, or associate to a lay-person who has not sought his advice regarding employment of a lawyer.
* * * * * *

DR 2-106 Fees for Legal Services.
[A] A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
[B] A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
[1] The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
[2] The likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer.
[3] The fee customarily charged in the locality for similar legal services.
[4] The amount involved and the results obtained.
[5] The time limitations imposed by the client or by the circumstances.
[6] The nature and length of the professional relationship with the client.
[7] The experience, reputation, and ability of the lawyer or lawyers performing the services.
[8] Whether the fee is fixed or contingent.
* * * * * *

DR 9-102 Preserving Identity of Funds and Property of a Client.
[A] All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm *1300 shall be deposited therein except as follows:
[1] Funds reasonably sufficient to pay bank charges may be deposited therein.
[2] Funds belonging in party to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion not be withdrawn until the dispute is finally resolved.
[B] A lawyer shall:
[1] Promptly notify a client of the receipt of his funds, securities, or other properties.
* * * * * *
[3] Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
[4] Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.
NOTES
[1] Moyo testified he had an oral or written agreement with her for him to receive forty percent of the settlement. He was never able to produce any written documentation.
[2] In her testimony McLaurin was not asked about the three payments made to her in July, 1985, totaling $510.
[3] The Code section reads slightly different from § 19 of Chapter 408, which begins: "When a ward shall be entitled ..."
[4] The pertinent portions of all Disciplinary Rules cited in the opinion are set forth in the appendix.
[5] If they did, the guilty attorney not only would receive no fee, but find himself with other problems as well.
[6] See appendix.
[7] See appendix.
[8] See appendix.