## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 97-KA-00373-SCT

*KENNETH CLEMONS, JR. a/k/a KENNETH C. CLEMONS, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/12/97 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EDMUND J. PHILLIPS, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | KEN TURNER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 2/11/1999 |
| MOTION FOR REHEARING FILED: | 3/12/99 |
| MANDATE ISSUED: | 5/13/99 |

**EN BANC.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. This case arises from Kenneth Clemons' conviction for the July 15, 1996, murders of Cecil Amos, Frankie Amos, and Shirley Ann Davis. Clemons was sentenced by the Neshoba County Circuit Court to serve two consecutive life sentences in prison, to run concurrently with a third life sentence. Clemons' subsequent motion for a new trial was denied. On appeal, Clemons raises the following issues for consideration by this Court:

**A. WHETHER THE APPELLANT'S CONFESSION WAS INVOLUNTARY AND WITHOUT AN INTELLIGENT WAIVER OF HIS RIGHTS?**

**B. WHETHER THE CIRCUIT COURT ERRED IN SUSTAINING THE STATE'S OBJECTION TO ADMISSIBILITY OF MEDICAL OPINIONS CONTAINED WITHIN THE COURT FILE OF THIS CASE AND OF COMPANION CASE AGAINST CO-INDICTEE BOBBY CLEMONS?**

**C. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE INTRODUCTION OF EVIDENCE THAT CO-INDICTEE TIMOTHY SUDBERRY HAD AGREED TO PLEAD GUILTY TO A CHARGE RESULTING FROM THE SAME CRIME AS APPELLANT WAS CHARGED DENIED APPELLANT A FAIR TRIAL?**

¶2. This Court finds that the issues raised by Clemons are without merit. Accordingly, the judgment of the trial court is affirmed.

## STATEMENT OF THE FACTS

¶3. On July 16, 1996, the bodies of Cecil Amos, Frankie Amos, and Shirley Ann Davis, were found in Cecil Amos' car, which was parked at the Nanihwaiya Caves in Neshoba County. The three members of the Choctaw tribe had been shot to death.

¶4. Three days later, the police arrested Timothy Sudberry, and brothers Kenneth Clemons and Bobby Clemons [hereinafter Bobby]. Sudberry led the authorities to two guns, which matched the ballistic evidence from the crime scene.

¶5. At the time of his arrest, fourteen-year-old Kenneth Clemons was advised of his rights and asked several times whether he understood them. He acknowledged that he did, and signed the waiver of rights form. Clemons then stated that he and his brother ( Bobby) remained in a separate vehicle, while Sudberry murdered the people in Amos' car. When confronted with the fact that this statement did not conform with the physical evidence, however, Clemons changed his statement. Clemons told the police that Cecil Amos owed him ten dollars, and, at Amos' suggestion, Clemons agreed to meet Amos at "the caves" for a beer. Clemons described his role in the killings:

> I asked Cecil if he had my money. When I got out of my car, I had a chrome with pearl handle twenty-five automatic in my back -- in my pocket. When Cecil was walking back to sit down after getting the beer, I pulled the twenty-five automatic out of my right back pocket with my right hand. I was holding the gun behind me in my left hand. I had moved the gun from my right hand to my left to hide it behind me. I was looking at Cecil as he was sitting in the car. I was standing about eight feet away from him.

> I said, "You got my money?" Cecil replied, "No, I don't have it." I was thinking all them together should have about four thousand dollars. When Cecil told me he didn't have my money, I came out with a twenty-five automatic pistol in my left hand pointed straight at his forehead area.

> I fired the pistol by accident, and the bullet hit him somewhere in the side of the head. I knew I hit him because I saw blood coming from behind his left ear area.

> His head fell to the right side of the car, and he slumped over. Timothy Sudberry and Bobby Clemons were still sitting in the car. I saw Frankie Amos look at me, but he didn't say anything. He looked scared.

> The girl in the back started screaming and hollering. I stepped up inside the car to where I was leaning inside the car with my gun still in my left hand and shot Frankie one time in the chest area. Frankie's head fell forward and began to shake from side to side. I then turned the gun toward the girl and shot. I don't know where that shot went.

I saw somebody coming from behind me and going around the trunk of Cecil's car to the passenger side. I saw them with the nine millimeter pistol in their hand.

They got to the passenger side. The girl in the back of the car, her head was already hanging down forward.

When the person got to where the girl was sitting on the passenger side, he shot the girl one time. I then heard two more shots from the nine millimeter as I was going back to our car. Bobby Clemons and Timothy Sudberry came back to the car after I had got in the car. Timothy Sudberry had a nine millimeter pistol in his hand when he got back in the car.

## LEGAL ANALYSIS

### A. WHETHER THE APPELLANT'S CONFESSION WAS INVOLUNTARY AND WITHOUT AN INTELLIGENT WAIVER OF HIS RIGHTS?

¶6. Clemons first contends that his statement to the police should not have been admitted. Three officers testified at the hearing on Clemons' motion to suppress the confession: Neshoba County Deputy Sheriff Thomas Thornton; Highway Patrol Officer Allen Stewart; and, Philadelphia Police Officer Tommy Waddell. The officers testified that Clemons did not appear to be under the influence of drugs or alcohol, and that neither threats nor promises were made to Clemons. Clemons never requested an attorney, or asked for the questioning to cease. Deputy Thornton stated that, due to Clemons' age, the authorities took great care to ascertain that Clemons understood the *Miranda* warnings, prior to questioning.

¶7. As stated earlier, Clemons first implicated Sudberry, but Officer Stewart had difficulty resolving Clemons' statement with the physical evidence. Officer Stewart became impatient and left the interview, because he felt that Clemons was not telling the truth.

¶8. Ultimately, a tearful Clemons told Officer Thornton that he wanted to tell the truth about what had happened. Clemons then gave the aforementioned statement, in which he admitted that he shot all three victims. Thornton testified at trial that he wrote down everything Clemons told him. Thornton read each page to Clemons, and gave Clemons the opportunity to read and revise the statement before signing it. According to Thornton, Clemons offered no changes, and signed each page of the statement.

¶9. Clemons first asserts that the circuit court erred in admitting his confession because, considering his age and education[1], he could not have voluntarily given the confession and/or intelligently waived his rights. There is no merit to this assignment of error.

¶10. When determining the admissibility of a minor's confession, inquiry must be made into the totality of the circumstances surrounding the interrogation. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Looking at the totality of the circumstances -- particularly the testimony of the investigating officers, the absence of any evidence of mental or intellectual impairment reducing Clemons' ability to understand his rights and the waiver thereof, or any special factors attributable to his age -- it cannot be said that the circuit court erred in admitting the confession.

¶11. This Court, in reviewing the voluntariness of a confession given in youth court, has found that age is a factor to consider in determining the admissibility of a confession. *In the Interest of W.R.A.*, 481 So. 2d

280, 286 (Miss. 1985). However, as the Court cautioned, "[f]or the law to pronounce that such a person has no capacity to understand and waive his privilege against self-incrimination would amount to a declaration incongruent with reality. The youth factor, accordingly, is seldom *per se* conclusive that a confession was not freely and voluntarily given." *W.R.A.,* 481 So. 2d at 286.

¶12. No evidence was presented to suggest that Clemons' intellectual capacity was such that his ability to understand the waiver of rights or voluntarily make a confession was impaired. To the contrary, despite his poor academic record, the psychiatric evaluation indicated that Clemons was of "normal intelligence", and, at trial, his mother observed only that he was more interested in sports than school. Moreover, even in those cases where a minor has been shown to have a learning disability or below average intelligence, this Court has upheld the trial court's finding that the minor had sufficient capacity to knowingly and intelligently confess. *McGowan v. State*, 706 So. 2d 231, 236-37 (Miss. 1997).

¶13. Clemons also asserts that, because neither of his parents were present during his interrogation, his understanding of his rights was diminished and the interrogation was coercive. Clemons testified that he asked to see his parents, but Deputy Thornton would not allow it. He also testified that the police told him that, if he signed the statements, he could see his parents. To the contrary, however, all three officers testified that Clemons did not ask to see either of his parents. Deputy Thornton and Officer Stewart also denied that Clemons was promised that he would be allowed to see his parents, if he signed the statement. In addition, Mrs. Clemons testified that Thornton saw her in the hallway, told her that she could not see her son, and asked her to leave, because she was interfering with the investigation. However, Deputy Thornton did not recall seeing Mrs. Clemons.

¶14. Based on this conflicting testimony, Clemons argues that the confession should have been suppressed. However, Clemons' assertion (that he should have been allowed to have a parent present during the interrogation) is without merit. *See Blue v. State*, 674 So. 2d 1184 (Miss. 1996) (where crime is such that circuit court has original jurisdiction, "age had no special bearing on his ability to be questioned without a parent and voluntarily waive his rights."). *See also* Miss. Code Ann. § 43-21-151 (giving circuit court original jurisdiction in cases "where any act committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death"). Thus, given the totality of the circumstances, the trial court did not err in admitting Clemons' statement.

## B. WHETHER THE CIRCUIT COURT ERRED IN SUSTAINING THE STATE'S OBJECTION TO ADMISSIBILITY OF MEDICAL OPINIONS CONTAINED WITHIN THE COURT FILE OF THIS CASE AND OF COMPANION CASE AGAINST CO-INDICTEE BOBBY CLEMONS?

¶15. During the suppression hearing Clemons' attorney sought to introduce Dr. Donald Guild's psychiatric evaluations of both Kenneth and Bobby Clemons. Apparently, Dr. Guild's evaluation of Bobby included a statement that Bobby had sufficient ability to understand the *Miranda* rights. However, Dr. Guild's evaluation of the appellant did not contain similar language. Dr. Guild, who was not a witness at the trial, evaluated Kenneth Clemons as follows:

Mr. Kenneth Clemons is a 15 year old black male who was seen for psychiatric evaluation on December 23, 1996. He had a good understanding of the charges against him, and generally the circumstances surrounding the charge. He was felt to be of normal intelligence. He gave his history in a full comprehendible manner and had no evidence or history of psychotic thinking or behavior.

Based on this interview and the history received, I feel he is competent to stand trial, and capable of assisting his attorneys in his defense. He has a good understanding of his situation, possible defenses and alternatives.

As to the time of the alleged crime he is capable of knowing the difference between right and wrong, and the nature and quality of his actions.

¶16. Clemons now asserts that the medical documents should have been admitted as an exception to the hearsay rule, and cites Mississippi Rule of Evidence 803(4) and (8). However, the burden is on the appellant to provide this Court with the record necessary to support his assignment of error. *Underwood v. State,* 708 So. 2d 18, 26 (Miss. 1998); *Jackson v. State,* 684 So. 2d 1213, 1224 (Miss. 1996); *Williams v. State*, 522 So. 2d 201, 209 (Miss.1988). Clemons has not done so. Any truly meaningful discussion of the assignment of error is impossible without a copy of Dr. Guild's evaluation of Bobby Clemons.

¶17. In addition, the relevancy and admissibility of evidence is within the discretion of the trial court. *See* M.R.E. 401, 402, and 403. Given the record before us, there is no evidence that the trial judge erred in excluding Dr. Guild's report. *See* M.R.E. 103 (a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . .").

## C. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE INTRODUCTION OF EVIDENCE THAT CO-INDICTEE TIMOTHY SUDBERRY HAD AGREED TO PLEAD GUILTY TO A CHARGE RESULTING FROM THE SAME CRIME AS APPELLANT WAS CHARGED DENIED APPELLANT A FAIR TRIAL?

¶18. Clemons also argues that the trial court erred in admitting co-indictee Sudberry's testimony regarding Sudberry's entry of a guilty plea in connection with this crime. The record reflects that Sudberry denied actually shooting any of the three victims, but admitted that he pled guilty to accessory after the fact for his participation in hiding the gun that Kenneth Clemons used. Clemons did not lodge a contemporaneous objection to this testimony. Therefore, consideration of this issue on appeal is precluded. *See Williams v. State*, 684 So. 2d 1179, 1189 (Miss. 1996).

¶19. However, even if this Court were to consider the merits of this issue, Clemons' argument fails. Clemons contends that the admission of co-indictee Sudberry's guilty plea was improper. In support of this argument, Clemons cites *Johns v. State*, which is one of several cases, in which this Court has held that it is improper to introduce an accomplice's conviction of the same crime for which the defendant is being tried. *See, e.g., Johns v. State*, 592 So. 2d 86, 89 (Miss. 1991); *Henderson v. State*, 403 So. 2d 139, 141 (Miss. 1981); *Griffin v. State*, 293 So. 2d 810 (Miss. 1974).

¶20. The same argument was rejected in *White v. State*, 616 So. 2d 304, 307 (Miss. 1993). In *White*, this Court held that the prior line of cases was distinguishable,

because we are dealing with a plea of guilty in the instant case; that is, a prior admission of guilt, which is consistent with the testimony at trial. This is a significant distinction because prior statements have evidentiary value different from prior findings of other tribunals.

Moreover, whether an error in admitting this evidence is sufficiently prejudicial to warrant reversal

may be resolved differently where the offending evidence is no more than a repetition of what is said by the witness before a jury and subject to cross examination, as opposed to evidence of the collective judgment of another jury.

*White*, 616 So. 2d at 307-308. *See also* [*Henderson v. State*, No. 97-KA-00775-SCT, slip op. at 8-9 (Miss. Feb. 4, 1999)](#).

¶21. Based on this authority, Clemons' argument is without merit. This is particularly true, given that Clemons' attorney avidly cross-examined Sudberry about the guilty plea. Thus, Clemons' argument on this point would fail, even if its consideration were not procedurally barred.

## CONCLUSION

¶22. The issues raised by the appellant are without merit. Accordingly, the judgment of the trial court is affirmed.

¶23. **COUNT I. CONVICTION OF MURDER AND SENTENCED TO LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**COUNT II. CONVICTION OF MURDER AND SENTENCED TO LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**COUNT III. CONVICTION OF MURDER AND SENTENCED TO LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**COUNT I AND COUNT II TO RUN CONSECUTIVELY AND COUNT III TO RUN CONCURRENTLY WITH COUNTS I AND II.**

**PITTMAN, P.J., ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND BANKS, J.**

**McRAE, JUSTICE, DISSENTING:**

¶24. The Legislature and this Court have already defined what is a minor. By law, a minor may not waive any rights regardless of intelligence, maturity, or street sense. Hence, regardless of the criminal charge, a minor cannot waive the constitutional right to have an attorney or parent present, and have the confession admitted. I disagree with the majority's affirmation of the circuit court's finding that the confession of a fourteen-year-old youth was given knowingly and intelligently. Children brought in for questioning or

accused of criminal acts in this State are prosecuted in circuit court as adults pursuant to Miss. Code Ann. §§ 43-21-151(1)(a) and (b)(1996). The legislature has declared that minors are to be protected by sheltering them under the disability of minority since they do not have the requisite intellectual or emotional capacity to make decisions for themselves. Despite the protection extended those under the age of twenty-one, regardless of intelligence or sophistication, in the civil context and in some cases, where crimes are committed against minors, there is no corollary in the criminal context. While a child who has not reached his thirteenth birthday cannot be held criminally liable or criminally prosecuted for a misdemeanor or felony pursuant to Miss. Code Ann. § 43-21-151(3)(1996), once that birthday is past, he is treated like an adult. § 151(1)(a) and (b)(1996). Under too many tragic factual scenarios that any of us who have raised a family can imagine, a young person can be hauled into police custody and stripped of his constitutional rights before his guilt or innocence is established without the presence of a parent or other adult, allowing the police to "rubber hose" him into submission. What happens when the police take a minor into custody for questioning although no charges have been brought against him? Can the minor waive his constitutional rights then? The legislature has declared that a minor is anyone under the age of twenty-one. Nevertheless, in the case *sub judice*, where life and liberty interests are at stake, the majority has declared that a fourteen-year-old can knowingly and intelligently waive his rights.

¶25. Contrary to the prevalent presumption in our laws governing civil matters that minors, lacking the necessary emotional and intellectual capacity to make an informed decision, are possessed of an innocence to be protected, our criminal law and statutes are premised on the notion that every child brought in for questioning by police is hardened and street wise. Regardless of whether the child is taken into custody with a gun in her hand or as the result of mistaken identity, a child is more likely vulnerable to adult authority; that vulnerability renders the exercise of authority inherently coercive, especially in those instances where the child is emotionally or intellectually immature or impaired. Thus, the unfortunate reality is that particularly under a barrage of hostile questions, even an innocent child will respond by giving the answers it believes the authority figures wants to hear.

¶26. After a 'waiver" and confession have been obtained, the police have the ability to charge a minor as an adult or to send the case to youth court. When is it determined whether § 43-21-151(1)(a) and (b) or the Youth Court Act is applicable? It is not so determined. The circumstance begs for a bright line rule.

¶27. A minor charged but not yet convicted of a serious felony nonetheless is afforded absolutely no protection of his Constitutional rights when taken into custody under our present statutory system. This is contrary to what the United States Supreme Court long ago found in *Powell v. Alabama,* 287 U.S. 45 (1932), where the convictions of three youths were reversed because they had not been accorded a meaningful opportunity to exercise their right to counsel in contravention of the due process clause of the fourteenth amendment to the United States Constitution. Justice Sutherland, writing for the Court, stated:

> . . . The record does not disclose their ages, except that one of them was nineteen; but the record clearly indicates that most, if not all, of them were youthful, and they are constantly referred to as 'the boys.' They were ignorant and illiterate. All of them were residents of other states, where alone members of their families or friends resided.

> However guilty defendants, upon due inquiry, might prove to have been, they were, until convicted, presumed to be innocent. It was the duty of the court having their cases in charge to see that they were denied no necessary incident of a fair trial.

*Powell*, 287 U.S. at 51-52. It was the duty of the Neshoba County court to see that Clemons, whatever the jury's verdict, was accorded a fair trial at every step of the proceedings. It further is the duty of this Court to see that the Constitutional rights of minors in this State are protected at every step of the criminal process and that they are given all of the rights incident to a fair trial.

¶28. Only in youth court does our statutory system entitle a juvenile charged with a crime to have even a parent present when making a confession. Miss. Code Ann. § 43-21-303(3)(1979). When a youth is charged with a crime punishable by death or life in prison or for any act attempted or committed with the use of a deadly weapon or a shotgun or rifle, which would be a felony if committed by an adult, pursuant to Miss. Code Ann. §§ 43-21-151(1)(a) and (b)(1996), the circuit court has original jurisdiction and there are no safeguards to protect a minor's interests. Thus, whether a minor charged with a such has just celebrated his thirteenth birthday, or as in this case, is fourteen years old, he or she is treated as an adult and under the law, can be found to have "voluntarily and intelligently" waived his rights and given his confession. Such a system, especially in light of the safeguards provided for minors in civil matters, violates minors' rights. It is incongruous that the statutes and common law of this state provide all manner of protection of a minor's interests, yet, when we are faced with his liberty interests, no protection whatsoever is afforded.

¶29. Our Constitution and laws provide greater protection for minors since they are believed to be lacking the experience as well as the emotional and mental maturity of the average adult. Because the legally recognized disability of minority is directly related to a child's ability to make an informed decision, a minor should not be treated as an adult in when authorities are determining whether the accused knowingly and intelligently waived his constitutional rights prior to police interrogation. Surely when a minor's life or liberty interests are at stake, this Court and the Legislature should not lose sight of the fact that minors "are disabled under the law to act for themselves" and provide the same protection in the criminal context that has been given to minors in civil matters and most other areas of the law. ***Mississippi State Bar Ass'n v. Moyo***, 525 So. 2d 1289, 1293 (Miss. 1988). The common law has recognized a distinction between adults and children even in the criminal context:

> At the early common law infancy apparently was not a defense to a criminal prosecution, although a youthful defendant usually received a pardon. In the tenth century, by statute no one under the age of fifteen could be subjected to capital punishment unless he attempted to escape or refused to give himself up. Finally, by the beginning of the fourteenth century it was established that children under the age of seven were without criminal capacity. Seven was the age of responsibility under the Roman Civil Law and this probably influenced the common law through Canon Law.

> By 1338 infants over seven were presumed to lack to commit crime, but the presumption could be rebutted by proof of malice, which in turn could be shown by concealment of the crime. At this time, the age at which the presumption of incapacity no longer was applicable had not been precisely fixed, but bu the seventeenth century the age of discretion had been established at fourteen. The common law thus had developed to its present form: (1) children under seven had no criminal capacity; (2) children at age fourteen and over had the same criminal capacity as adults; and (3) children over seven and under fourteen were presumed to be without capacity, but this presumption could be rebutted in an individual case.

LaFave, Substantive Criminal Law, Vol 1., § 4.11 at 566 (West 1986)(footnotes omitted).

¶30. Given the current state of our law in civil matters, the issue of protecting minors' rights in the criminal

context demands our attention and review. In Miss. Code Ann. §§ 1-3-21 and 1-3-27 (1964), "minor" and "infant" are identically defined as "any person, male or female, under twenty-one years of age." These definitions are not limited to the civil context; rather, the statutes provide that they are applicable to the terms as used "in any statute." The meaning of the disability of minority is thus articulated:

> The disabilities of infancy are in fact personal privileges conferred on infants by law, and as such they constitute limitations on the legal capacity of infants, not to defeat their rights, but to shield and protect them from the acts of their own improvidence as well as from acts of others. . . .
>
> * * * * *
>
> Because of their lack of mature judgment, infants are under recognized disabilities in many respects, and their activities and conduct may be regulated and restricted to a greater extent than those of others. . . .
>
> * * * * *
>
> While a person is an infant in the eyes of the law until he arrives at the age of majority fixed law, his actual capacity to do acts involving legal consequences and the practical necessity of his doing such acts increase from babyhood to the age of majority, and the law necessarily recognizes such progressive capacity. . . .

*See* 42 Am. Jur. 2d *Infants* §§ 1, 8 and 9 (1969)(citations omitted). This Court further has explained the disability of minority:

> **Infants and persons of unsound mind are disabled under the law to act for themselves. Long ago it became the established rule for the court of chancery to act as the superior guardian for all persons under such disability.** This inherent and traditional power and protective duty is made complete and irrefragable by the provisions of our present state constitution. It is not competent for the Legislature to abate the said powers and duties or for the said court to omit or neglect them. **It is the inescapable duty of the said court and of the chancellor to act with constant care and solicitude towards the preservation and protection of the rights of infants and persons non compos mentis.** The court will take nothing as confessed against them; will make for them every valuable election; will rescue them from faithless guardians, designing strangers, and even from unnatural parents, and in general will and must take all necessary steps to conserve and protect the best interest of these wards of the court. The court will not and cannot permit the rights of an infant to be prejudiced by any waiver, or omission or neglect or design of a guardian, or of any other person, so far as within the power of the court to prevent or correct. All persons who deal with guardians or with courts in respect to the rights of infants are charged with the knowledge of the above principles, and act to the contrary thereof at their peril.

*Moyo*, 525 So. 2d at 1293 (citation omitted)(emphasis added)(*quoting Union Chevrolet Co. v. Arrington*, 162 Miss. 816, 826-27, 138 So. 593, 595 (1932)). It necessarily follows that we should treat those under the disability of minority on the same footing as we treat those of unsound mind.

¶31. The age of the accused is always a factor to consider in the admissibility of a confession. *In Interest*

*of W.R.A.*, 481 So. 2d 280, 286 (Miss. 1985). The consideration of age in determining the issue of waiver is entirely consistent with our case law governing minors. In order to protect children, we consistently have held that minors do not have the requisite emotional or intellectual maturity to consent. For example, Miss. Code Ann. § 97-3-65(1)(b)(1998) makes it a crime for a person of any age to have intercourse with a child who is under the age of fourteen or who is twenty-four or more months younger than the person. The offender is held accountable regardless of the minor's consent or lack of chastity. § 97-3-65(c). There further is a proscription against the fondling of a child under the age of sixteen years by a person over the age of eighteen years "with or without the child's consent." Miss. Code Ann. § 97-5-23(1) (1998). Section 97-5-23(2) raises the age to eighteen years in those instances where the offender "occupies a position of trust or authority over the child."

¶32. In the civil context, minors cannot legally enter into contracts, buy or sell property, vote, maintain a residence or even choose the parent with whom they care to live when their parents divorce. Minors are considered incapable of making such decisions because of their lack of mental maturity. Thus, they are shielded from harm by laws prohibiting them from purchasing tobacco or alcohol or entering as casinos and other venues of "adult" entertainment until they reach the age of twenty-one. Since the time of *Price v. Crone*, 44 Miss. 571 (1871), this Court also has given special protection to the rights of minors. In that case, the Court noted that "it is the duty of the Chancellor to protect the rights of minors, whether the proper defense has been made or not. Nothing is taken as confessed or waived by the minor or her guardian."*Id*. at 575.

¶33. For purposes of service of process, this Court has held that there can be no waiver by a juvenile of actual service. *Khoury et al. v. Saik*, 203 Miss. 155, 33 So. 2d 616, 618 (1948). There, we reasoned that "minors can waive nothing. In the law they are helpless, so much so that their representatives can waive nothing for them." *Id.*

¶34. The rationale expressed in *Khoury* has been applied also to the law of contracts. When contracts for the sale of land are made by minors, they are voidable at the option of the minor. *Edmunds v. Mister*, 58 Miss. 765 (1881). Generally, an infant has the right to disaffirm a contract of purchase of land even though it has been executed. 43 C.J.S. Infancy § 138 (1978). In fact, a minor in Mississippi does not have the capacity even to bind himself absolutely to a contract. *Shemper v. Hancock Bank*, 206 Miss. 775, 40 So. 2d 742, 744 (1949)(a minor did not assume liability in a partnership because the partnership was a contractual relationship in which the minor had no capacity to enter). *See also* Miss. Code Ann. § 93-19-13 (allowing only those individuals over age of eighteen to contract); Miss. Code Ann. § 15-3-11 (1972) (setting forth statutory steps for person of majority to ratify contract entered into as minor).

¶35. In recognition of minors' relative inability to act maturely on their own behalf, courts also give special protection to minors in the law of adverse possession. The ten year term provided in our adverse possession statute simply "does not begin to run against minors until the disability of minority has been removed."*Wilder v. Currie*, 231 Miss. 461, 95 So. 2d 563, 571 (1957); Miss. Code Ann. § 15-1-7 (1995). Likewise, the statute of limitations for a minor to bring a personal action is tolled until the disability of minority is removed. Miss. Code Ann. § 15-1-59 (1995). This Court also recognizes the disability and waits until minority is removed to permit the time for taking an appeal to run. M.R.A.P. 4(f). Even when the minor has a guardian ad litem, he is given two years within which to file his appeal to this Court instead of the normal thirty days. *Id.*

¶36. In certain circumstances where the child's interests would be adversely affected by litigation, courts must appoint a guardian ad litem to act for the benefit of a minor child. *See* Miss. Code Ann. § 43-21-121 (1972). The purpose is to protect a child who is incapable of acting in his own defense in a knowing and intelligent manner. In *Alack v. Phelps*, 230 So. 2d 789, 792-793 (Miss. 1970), where two children, adopted by their grandparents, were allowed to bring suit, through their guardian, for the wrongful death of their natural father, we stated, "children are under the disability of minority and cannot act for themselves" and therefore, "the equity court will protect their rights." *Id.* at 793. No such protection is offered, however, to a minor hailed into circuit court on criminal charges. The seminal case of *Miranda v. Arizona*, 384 U.S. 436 (1966), provides that:

> [T]he modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, "Since *Chambers v. Florida*, 309 U.S. 227, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms.

> \* \* \* \* \*

> [T]here can be no doubt that the Fifth Amendment privilege . . . serves to protect person in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. . . .

> It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws.

*Id.* at 448, 467. As the Supreme Court states in *Miranda*, there may be situations in which additional safeguards may be necessary. This case involves such an instance. Minors do not have the capacity to act on their own. An advocate is necessary to properly protect the rights of children from potential injustice. This is particularly so where, as in the instant case, there is no audio record. Consider further that the Mississippi legislature has created a skewed statute that imprudently automatically removes a child's minority as to classification of incidents rather than so removing as to the ability of that child. Miss. Code Ann. §§ 43-21-151(1)(a) and (b). In such a situation, a child is automatically charged as an adult.

¶37. There are few, if any, situations in which a minor's decision may have so profound an impact upon his life and liberty as the waiver of his constitutional rights in the face of serious criminal accusations. Given the protection our courts afford minors in most other areas of the law, Clemons should not have been allowed

to enter into such a fundamental decision without more procedural safeguards. This was a violation of his fourteenth as well as his fifth amendment rights. Certainly none among us would disagree that early in a child's development, he is incapable of knowingly and intelligently waiving his rights. We cannot make the convenient assumption that every child taken into police custody is a streetwise criminal.

¶38. The Legislature has made a bright line determination that anyone under the age of twenty-one is a minor. It further has declared that minors are incompetent, no matter how streetwise or intelligent they may be. That is why, in the civil context, measures have been taken to safeguard minors' interests. In the criminal context, we cannot lose sight of the fact that the child has only been accused and not convicted; the presumption of innocence remains. Why has the Legislature chosen to protect only those children questioned about or charged with misdemeanors and minor offenses? Why is no protection afforded to the child brought into custody for a more serious crime where his life and liberty interests are at stake? Because the decision to waive the right to remain silent, the right to effective counsel, and the right against self-incrimination is certainly as monumental and potentially life altering as the right to enter into a contract, the protection offered a minor accused of a crime should be no less. At the very least, a minor taken into police custody should not be compelled to waive any of his constitutional rights or to give a confession without the presence and advice of an attorney, parent or advocate appointed to protect his interests.

¶39. Hypothetically, under today's majority decision, a minor may be brought in for questioning about a burglary. During questioning, he admits that at the time of the incident, he had a gun in his back pocket. Before mention is made of the gun, his confession is inadmissible because a parent was not present as required by the Youth Court Act. The moment the gun comes into play, the rules change. The child may then be sentenced as an adult and his confession admitted regardless of whether a parent, attorney, or other advocate is present. The result is a disingenuous trampling of the child's constitutional rights. Accordingly, I dissent.

**SULLIVAN, P.J., AND BANKS, J., JOIN THIS OPINION.**

1. Clemons was fourteen years old at the time of his arrest. He testified that he had been "passed up" from the seventh to the eighth grade, and had not passed the eighth grade. His mother testified that he made poor grades, and was more interested in sports than in his education.