# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-00849-SCT

*DERRICK RAMONE HALL a/k/a DERRICK HALL*
*a/k/a DERRICK R. HALL*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/2017 |
| TRIAL JUDGE: | HON. M. JAMES CHANEY, JR. |
| TRIAL COURT ATTORNEYS: | RICHARD EARL SMITH, JR. |
| | MARCIE TANNER SOUTHERLAND |
| | STEPHEN LEE McMILLIN |
| | KIMBERLY WALKER NAILOR |
| | MICHAEL ELIAS WINFIELD |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/07/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. In May 2017, Derrick Hall was convicted by a jury of first-degree murder in the Warren County Circuit Court. Due to his status as a habitual offender, Hall was sentenced to serve life in prison. Having his posttrial motion for a judgment notwithstanding the verdict (JNOV) denied by the circuit court, Hall now seeks relief from this Court. Finding

no error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     On the night of May 6, 2015, Kathryn Peacock was found dead in her home, the apparent victim of a gruesome murder. Peacock was nude and had suffered more than thirty stab wounds to her neck and throat, as well as defensive wounds to her arms and hands.

¶3.     Peacock's body was discovered by her boyfriend at the time, Devonzell Morgan. Morgan had last seen Peacock the night before, May 5, 2015. He stated that he and Peacock had gone out for dinner, then returned to her home afterward. And around 5:30 p.m., Morgan left Peacock's home for the evening. He texted her "good night" later that night, to which Peacock responded "good night." The following morning, Morgan texted her "good morning," to which she replied around 6:40 a.m.

¶4.     When Morgan left work around 11:00 a.m., he texted Peacock several times but received no reply. Around 3:00 p.m., he again tried texting Peacock, to no avail. Morgan then called Peacock, but she did not answer or return any of his texts. Worried, Morgan and his brother, Matthew, drove to Peacock's home to check on her.

¶5.     When they arrived, Morgan knocked on Peacock's door, but no one answered. He then knocked on her window with a broom and eventually went to check her door. Morgan claimed that Peacock had three locks on her door, which she always used—but when Morgan checked, the door was unlocked. Concerned, he entered Peacock's home and began looking for her. Morgan then discovered Peacock's nude body on her bathroom floor, with her lower half covered by bath drapes. Shocked, Morgan touched Peacock on the shoulder and said,

2

"Kat." He then closed her eyes, and ran outside to alert Matthew. Once Morgan informed Matthew of his discovery, the two reentered Peacock's home—Matthew saw Peacock's body and immediately ran back outside. Morgan then used Peacock's phone to call 911.

¶6. Police arrived on scene and found a distraught Morgan sitting on the curb. Noticing no signs of forced entry, police then entered Peacock's home and noted blood in a variety of locations, including blood-transfer patterns throughout the kitchen, on the floor leading into Peacock's bedroom, and in the bathroom where she was found. Investigators also identified a bloody shoe print on the kitchen floor. Upon inspection, it was determined that the print was made as someone left Peacock's home and derived from a Danskin brand shoe. The print did not match the shoes worn by Morgan.[1]

¶7. From inside Peacock's home, investigators collected the following: (1) a bloody, white tank top, found in a clothes basket; (2) a long-handled steak knife with a bent tip and what appeared to be blood, which was found under clothes on the floor; and (3) a pair of bloody, women's underwear, located in the bathroom's garbage can. In addition, investigators observed cleaning supplies in the bathroom, surmising that a clean-up attempt had been made.

¶8. Moving outside Peacock's home, investigators searched her vehicle, which was parked in her driveway. Found inside her car was a pair of Nike Air Jordans and a white t-shirt, both of which had blood on them. A spot of blood was noted on the back seat, and a

_____

[1] Police ultimately ruled out Morgan as a suspect, as his cell-phone records and his employer both corroborated his whereabouts during the day. Police likewise ruled out Peacock's ex-husband, as records revealed that he was incarcerated on the date of Peacock's murder.

3

Brillo pad with what appeared to be carpet-like fibers within it was found.

¶9.     That same evening, investigators were approached by Hall's mother, Jovita Hall, who lived nearby. Jovita told investigators that she had seen Hall wearing clothes in her home earlier that day that she knew were not his because they were too small for him. This information rendered Hall a possible suspect. As a result, investigators obtained a search warrant for Jovita's home and seized the following items: (1) a pair of black Danskin shoes, with blood on them; (2) a pair of black stretch pants, with blood on them; and (3) a brown tank top. When inspected, the soles of the Danskin shoes matched the bloody shoe print identified in Peacock's kitchen. While at Jovita's, investigators also seized a pair of gold Levi jeans, which also had blood on them. The next day, Jovita contacted investigators again, stating that she had discovered a pair of blue boxers with bloodstains—in response, investigators seized the boxers, as well as a red shirt.

¶10.     Evidence submitted to the Mississippi Crime Laboratory revealed the following DNA results:

- Blood found on the Nike shoes in Peacock's car was Peacock's blood, but no conclusive DNA profile was recovered from inside the Nikes;

- Blood found on the white t-shirt left in Peacock's car was Hall's blood;

- No conclusive DNA profile was obtained from the steering wheel of Peacock's car;

- The white tank top recovered from inside Peacock's home bore Peacock's DNA, as well as a Y-chromosome mixture, from which Hall and all his patrilineal male relatives could not be excluded—however, 99.9% of the world's male population could be excluded;

- The knife found in Peacock's home tested negative for blood and no

4

conclusive DNA profile was obtained;

- Blood from the bathroom sink and wall was Peacock's blood;

- The right Danskin shoe recovered from Jovita's possessed Peacock's DNA on the interior, with Peacock's blood on the exterior;

- The left Danskin shoe also recovered from Jovita's contained Peacock's blood on the exterior, but the interior of the shoe revealed a mixture of DNA profiles from which Hall was excluded;

- The black pants found at Jovita's had Peacock's blood on the front right leg; the interior waist band revealed a mixture of DNA profiles from which Peacock could not be excluded; Y-chromosome testing of the interior revealed a mixed DNA profile, of which Hall and all his patrilineal male relatives could not be excluded—however, 99.5% of the world's male population could be excluded;

- The gold Levi jeans recovered from Jovita's contained Hall's blood; and lastly

- The blue boxers found at Jovita's contained Peacock's blood, with Y-chromosome testing revealing a mixed DNA profile, of which Hall and all his patrilineal male relatives could not be excluded—however, 99.9% of the world's male population could be excluded.

¶11.   At trial, Cre'tarsha Taylor, Hall's cousin who resides across the street from Peacock's home, testified as to her encounters with Hall on May 6, 2015—the day of the murder. Taylor testified that she and Hall had smoked a cigarette together at her house around 6:00 a.m. She described Hall as wearing a long-sleeved red shirt with blue jeans and Nike Air Jordans. Taylor stated that she next saw Hall shortly after 7:00 a.m. on the side of Peacock's home—but this time he was in different clothes. At this time, Taylor said she saw Hall wearing a brown tank top with dark-colored sweat pants and shoes that he had just "stuck his [feet] in." Taylor then said that she witnessed Hall get into Peacock's car and drive off,

5

noticing a bag on the front passenger seat.

¶12.    Taylor testified that, around noon that same day, she saw Hall for a third time.  This time, she described Hall as sweating, and wearing blue jeans and a white tank top.  She claimed that Hall asked her for a bottle of water and a band-aid; though she did not have a band-aid, she noticed that Hall had blood on the top of his right hand.  When asked by Taylor whether she had seen him in Peacock's car, Hall stated, "No."  On cross-examination, Taylor did state that she saw a man named Calvin outside Peacock's home; Calvin is known for cutting grass in the neighborhood and walks with a cane.  She also noted two other men outside Peacock's home without shirts.

¶13.    It was after the information was provided by Jovita and Taylor that investigators chose to arrest Hall.  While arresting Hall, investigators observed a fresh cut on his right pinky finger, and a smaller cut on his palm.  Because Hall was intoxicated, police waited until the following day to question him.  So, on May 7, 2015, Hall was interviewed by investigators but denied any involvement in Peacock's murder.  Then, at his own request, Hall was interviewed again on May 18, 2015.  Portions of the interviews were played for the jury.

¶14.    Hall's first trial for the murder of Peacock ended in a mistrial.  In his first trial, Hall testified in his own defense.  In Hall's second trial, however, he declined to testify—as a result, the State introduced Hall's testimony from his mistrial, which was read into the record.

¶15.    In that, Hall stated that he and Peacock had visited three days before her murder, during which time the two had smoked marijuana for around an hour, and Hall had informed

6

Peacock of his plans to barbecue on May 6, 2015 (Hall's birthday). On the day Peacock was murdered, Hall testified that he was at or around Peacock's home three separate times. Hall stated that the first time was when he stopped at Taylor's house for a cigarette. Needing a grill for his barbeque, Hall said he then retrieved a grill from his friend's house. Hall said that he and his friend brought the grill to another friend's house where he and his brother, Kenneth, cleaned the grill. While cleaning the grill, however, Hall claimed that he cut his finger using a wire hanger attempting to prop up the grill.[2] Because he was bleeding, Hall claimed that he used the white t-shirt he was wearing to wrap his hand and stop the bleeding—he also stated that he was wearing gold jeans. Once the grill was operational, Hall went to Taylor's to get a band-aid and water. Hall claimed that he was not wearing a white tank top at that time, as described by Taylor. After leaving Taylor's, Hall said he went to Jovita's to get seasoning salts.

¶16.   Hall then dropped off the seasoning salts at the location where they were barbecuing, and while on his way back to Jovita's, he stopped by Peacock's. Hall testified that it was around 6:50 a.m. when he stopped at Peacock's. He said that he first knocked on Peacock's side window, as he normally does, but received no answer. He then went around to Peacock's door, which he claimed was partially ajar, knocked again, and called out to Peacock. Hall then entered Peacock's home and proceeded to find her on the floor, naked

---

[2] Vicksburg Police Investigator Bobby Jones testified that Hall had informed him he had cut his hand on a grill, and insisted that Jones inspect the grill to confirm Hall's story. Jones claimed to have gone and inspected the grill, but found no wire hanger as described by Hall. In Jones's report, however, he made no mention of inspecting the grill and did not include any photographs.

and dead.

¶17. Citing panic and untied shoes, Hall stated that he fell as he retreated from Peacock's body. Having gotten Peacock's blood on him when he slipped, Hall took off his shoes and put on Peacock's. He then placed Peacock's black sweat pants over his gold Levi jeans, and also put on Peacock's brown tank top. Hall then went outside and sat in Peacock's car, at which time Taylor saw Hall in Peacock's clothes. He stated that he left his Nikes and his white t-shirt in her car. And because Hall recently had been released from prison, he did not call the police, left Peacock's, and went to Jovita's wearing Peacock's clothes.

¶18. At Jovita's, Hall took a bath and changed clothes. He stated that he left Peacock's clothes at Jovita's, and that, due to his involvement with the Vice Lords (a gang whose colors are red and gold), he would not own blue clothing—thus denying that the blue boxers found at Jovita's were his. When cross-examined, however, Hall stated that he had not found Peacock's body until around 9:00 a.m. Instead, Hall claimed that it was 6:50 a.m. when he first knocked and received no answer, and so he left—but it was not until 9:00 a.m. when he actually found Peacock's body.

¶19. Rejecting Hall's theory of innocence, the jury found him guilty of first-degree murder. As a habitual offender, he was ordered to serve life in prison. The circuit court denied Hall's posttrial motion, which prompted this appeal.

**DISCUSSION**

¶20. Hall argues that the State's evidence was insufficient to support his conviction and, as a result, the verdict was against the overwhelming weight of the evidence. We disagree;

therefore, we affirm.

### I.      Sufficiency of the Evidence

¶21.    When the legal sufficiency of a conviction is challenged, this Court must discern whether the evidence shows "beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]" *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968). In doing so, we must view all evidence in the light most favorable to the State. *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005), *abrogated on other grounds by* *Little v. State*, 233 So. 3d 288, 291 (Miss. 2017). Should this Court determine that "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed legally sufficient. *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985). Because Hall did not confess, nor were there any eyewitnesses to the crime, this is a case based on circumstantial evidence. *Jones v. State*, 918 So. 2d 1220, 1234 (Miss. 2005). As such, the State bore the burden of proving Hall's guilt "not only beyond a reasonable doubt, but to the exclusion of every reasonable hypothesis consistent with innocence." *Beasley v. State*, 136 So. 3d 393, 402 (Miss. 2014) (citing *Leflore v. State*, 535 So. 2d 68, 70 (Miss. 1988)). That said, this Court will not disturb a conviction based upon circumstantial evidence unless it is opposed by a "decided preponderance of the evidence." *Leflore*, 535 So. 2d at 70.

¶22.    Hall was convicted under Mississippi Code Section 97-3-19(1)(a), which defines first-degree murder as: "The killing of a human being without the authority of law by any means

9

or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being[.]" Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). Thus, the State was required to prove that Hall: (1) killed Peacock; (2) without authority of law; and (3) did so with deliberate design to effect her death. *Id*.; *see also* **Beasley**, 136 So. 3d at 402. Though it is undisputed that Peacock was the victim of a homicide, Hall contends the State failed to prove with sufficient evidence that he was Peacock's killer. Instead, Hall claims the evidence proves only that he was in Peacock's home, and that he left with her clothing.

¶23. Reviewing the evidence in this case, we hold that the State proved beyond a reasonable doubt Hall murdered Peacock. First, Hall admitted that he was at or around Peacock's home three separate times the day she was murdered. Furthermore, Hall originally stated that it was around 6:50 a.m. when he found Peacock murdered in her home. But Hall also stated that when he found Peacock, she was not actually dead—rather, Peacock was making a gurgling sound, with blood pouring from her mouth and neck. And Taylor testified that she saw Hall outside Peacock's home in Peacock's clothes (which Hall admitted to wearing) shortly after 7:00 a.m. We find this sequence of events informative, as the record reflects that Peacock was alive until approximately 6:40 a.m., which is when she replied to Morgan's "good morning" text. As such, this Court finds the evidence produces a reasonable inference that Peacock was murdered at some time between approximately 6:40 a.m. and 7:00 a.m.

¶24. But more informative is the testimony of Dr. Lisa Funte—a forensic pathologist and the deputy chief medical examiner for the Mississippi Medical Examiner's Office. Funte

testified that the severity of Peacock's injuries would have killed her within a "matter of minutes." In addition, investigators on scene surmised that a clean-up attempt had been made—which further undercuts Hall's theory of innocence. Even more, Funte testified that the blood patterns found on Peacock's person and in her bathroom were consistent with a victim who originally was lying face down and then was turned over only after the blood had dried. Nonetheless, Hall's account is that he found Peacock alive and on her back—the same position in which she was found dead by Morgan and as evidenced in the record.

¶25. Under the time frame established from the record, then, the evidence creates a reasonable inference that Hall was in Peacock's home between 6:40 a.m. and 7:00 a.m., and that Hall murdered Peacock. And in reviewing the evidence in the light most favorable to the State, we hold that the jury's verdict is not opposed by a "decided preponderance of the evidence," nor is it "based on no evidence whatsoever," thus requiring reversal. *Beasley*, 136 So. 3d at 403 (quoting *Kitchens v. State*, 300 So. 2d 922, 927 (Miss. 1974)).

¶26. In fact, the DNA evidence in this case points almost entirely to Hall. To that end, Hall could not explain why the bloody white tank top found in Peacock's home contained a DNA mixture from which Hall could not be excluded, but that could exclude 99.9% of the world's male population. As to the blue boxers found at Jovita's, Hall vehemently denied that they were his—yet, the boxers contained Peacock's blood, as well as a Y-chromosome mixture from which Hall could not be excluded, but that likewise excluded 99.9% of the world's male population. But even without the forensic evidence derived from the boxers, Hall admitted to investigators that he was wearing those blue boxers when he allegedly slipped

11

and fell in Peacock's blood.

¶27. In a similar vein, Hall testified that he also was wearing his gold Levi jeans when he slipped—and because he had Peacock's blood on both his jeans and boxers, he chose to wear Peacock's sweat pants. But Taylor testified that Hall was wearing blue jeans that morning—not the gold Levi jeans recovered from Jovita's. And when tested forensically, Hall's gold jeans contained *only* his blood, which further belies his claim that he was wearing those jeans when he allegedly fell in Peacock's blood.

¶28. This Court also holds that the State provided sufficient evidence proving Hall murdered Peacock with deliberate design. "Deliberate design may be proved or inferred from the use of a deadly weapon." *Beasley*, 136 So. 3d at 402. To that end, a mere glance at the State's crime-scene photographs illustrates the gruesome manner in which Peacock was murdered. Testimony revealed that Peacock had been stabbed more than thirty times, mostly in her neck and throat. Moreover, Peacock's body evidenced defensive wounds to her arms and hands.

¶29. These injuries, when coupled with the blood-transfer patterns (found in multiple rooms of Peacock's home) and the fresh cuts on Hall's hand, reasonably suggest that a struggle ensued. And because "[t]he existence of a deadly weapon is a question of fact for the jury to decide," we find that the State's evidence could lead the jury to only one conclusion—that Peacock was deliberately murdered with a knife. *Id.* As such, we conclude that the jury reasonably could have rejected Hall's testimony as an unreasonable theory of innocence. *Id.* at 403. Therefore, we hold that the State presented sufficient evidence to

prove Hall guilty of deliberate-design murder.

## II.    Weight of the Evidence

¶30.    When the weight of the evidence is challenged, this Court will overturn a verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." **Bush**, 895 So. 2d at 844. In addition, this Court views all evidence in the light most favorable to the verdict. **Id**. "Factual disputes are properly resolved by a jury and do not mandate a new trial." **Beasley**, 136 So. 3d at 403.

¶31.    Hall argues here that, because the State's evidence was legally insufficient, the verdict is contrary to the overwhelming weight of the evidence. In its simplest form, this case presented to the jury two versions of how Peacock came to be murdered. The State, through its circumstantial evidence, labeled Hall as Peacock's killer. Attempting to cast doubt on the State's evidence, Hall's testimony espoused multiple theories through multiple inconsistent versions. At first, Hall denied any involvement in Peacock's murder. Hall then changed his story, outlining a version of events similar to that ultimately provided in his trial testimony—but inconsistencies were present. As is their province, the jury was free to accept or reject the witnesses' testimony, and this Court will not second-guess the jury's witness-credibility determinations. *See id.* at 404.

¶32.    The jury here accepted the State's evidence and its witnesses' version of events. This being so, allowing the jury's verdict to stand does not "sanction an unconscionable injustice," as the evidence does not "preponderate heavily against the verdict." **Bush**, 895 So. 2d at 844. As such, we conclude that the trial court did not err in denying Hall's motion for a new

13

trial.

## CONCLUSION

¶33.    In sum, our review of the record leads us to conclude that the State presented evidence

legally sufficient to convict Hall of first-degree murder, and the jury's verdict is not against

the overwhelming weight of the evidence.  Therefore, we affirm.

¶34.    **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR.  MAXWELL, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE OPINION.**