# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01009-COA

CORTEZ DEONTAE BASS A/K/A TEZ A/K/A          APPELLANT
CORTEZ BASS

v.

STATE OF MISSISSIPPI                               APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/13/2017 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CORTEZ DEONTAE BASS (PRO SE) |
| | HEATHER MARIE ABY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED: 12/11/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE IRVING, P.J., GREENLEE AND TINDELL, JJ.

### TINDELL, J., FOR THE COURT:

¶1. A Tunica County grand jury indicted Cortez Bass and Dedrick Small for the first-degree (deliberate-design) murder of Donterrius Jackson with a firearm enhancement. *See* Miss. Code Ann. §§ 97-3-19(1)(a) (Rev. 2014) & 97-37-37(1) (Rev. 2014). The Tunica County Circuit Court later granted Small's motion to sever his trial. Following the completion of Bass's trial, the jury found Bass guilty of first-degree murder. Because Bass was seventeen when he committed the crime, the circuit court held a sentencing hearing to determine whether he was entitled to parole eligibility under *Miller v. Alabama*, 567 U.S. 460

(2012). Finding that Bass was not entitled to any relief, the circuit court sentenced him to life without eligibility for parole (LWOP) for the murder conviction and to a consecutive five-year sentence for the firearm enhancement, with both sentences to be served in the custody of the Mississippi Department of Corrections (MDOC).

¶2. On appeal, Bass[1] argues the following: (1) actions by law-enforcement officers violated his right to be free from self-incrimination; (2) the circuit court erred by failing to grant a mistrial; (3) the State erroneously denied him access to Jackson's criminal history; (4) the State committed prosecutorial misconduct; (5) the verdict was against the weight of the evidence; (6) the circuit court erred by denying his request for expert-assistance funds for mitigation investigation; (7) the circuit court's imposition of his sentence violated his constitutional right to a jury sentencing; and (8) the circuit court erred by sentencing him to LWOP.

¶3. Finding no error, we affirm the judgment of Bass's conviction and sentence.

## FACTS

¶4. On the afternoon of March 10, 2014, Jackson and his friend, George Anderson, encountered Bass, Small, and Bass's cousin, Kendrick, at an intersection in Tunica. An argument erupted between the two groups. Seven witnesses testified that the altercation ended with Bass fatally shooting Jackson.

---

[1] In addition to the arguments Bass's appellate attorney submitted on appeal, Bass filed a supplemental pro se brief that raised additional issues.

¶5.     Prior to the shooting, witnesses testified that Jackson and Anderson were walking down Cotton Street when Bass drove by and tried to hit Jackson with his car. After missing Jackson, Bass drove away, and Jackson and Anderson entered a nearby house. Later that day, Jackson and Anderson exited the house and were standing near the Cottonland Village Apartments at the intersection of Beatline Road and Cotton Street, when Bass, Small, and Kendrick approached from the other side of the street. Although the two groups remained on their respective sides of the street, Bass and Jackson began to argue with each other.

¶6.     At Bass's trial, multiple witnesses testified that Bass and Jackson initially appeared to be headed toward a fistfight. According to one witness, however, Bass claimed just prior to the shooting that he was going to kill Jackson. Witness testimony varied as to whether or not Bass obtained the gun he used from Small. Witness testimony also varied as to whether Bass fired the gun once or twice. Multiple witnesses for the State testified, however, that they never saw Jackson pull out a weapon and that he was trying to run away when Bass shot him. The medical examiner who performed Jackson's autopsy testified that Jackson died from a gunshot wound to the back of his head.

¶7.     Jackson's younger brother, Kendarrius, testified that he witnessed Bass shoot his brother from the upstairs bedroom of his family's apartment. Kendarrius further testified that, after seeing the shooting, he retrieved a gun from a closet in the apartment and ran outside. Kendarrius stated that he no longer saw Bass in the area but that a crowd had gathered around his brother's body. As a result, Kendarrius testified that he shot the gun into

3

the air a few times to disperse the crowd. Kendarrius identified State's Exhibit S-11, a Davis P-380 semiautomatic handgun, as the weapon he fired into the air.

¶8.    Contrary to the testimony of the State's witnesses, Bass and his cousin, Kendrick, testified that Anderson escalated the altercation between the groups by saying, "Let's pistol play." Both Bass and Kendrick testified that Jackson then pulled out a gun and pointed it at them. In response, Bass and Kendrick stated that Small pulled out a gun of his own, a nine-millimeter handgun, which Bass snatched from Small. Bass's and Kendrick's testimonies differed as to what happened next. Bass testified that he fired the gun once and that he, Kendrick, and Small immediately ran back to his home on Cotton Street.[2] As he was running, Bass testified that he saw Jackson's brother, Kendarrius, arrive at the street corner and pick up Jackson's gun. Kendrick testified, however, that before Bass fired his shot, Kendarrius ran out of an apartment with a gun and started shooting at them. Despite this discrepancy, both Bass and Kendrick testified that Kendarrius followed them down the street toward Bass's house and shot in their direction.

¶9.    The State's witnesses corroborated that Bass, Kendrick, and Small ran to Bass's home on Cotton Street after the shooting. One witness testified, however, that as Bass ran by her he said, "I hope I killed that bitch." Lieutenant Dennis Hopson testified that he arrived at Bass's home shortly after the shooting to take Bass into custody. According to Lieutenant

_____

[2] The shooting occurred in front of 1251 Cotton Street, and Bass lived at 1185 Cotton Street. Both Bass and Kendrick testified it took them about ten seconds from the location of the shooting to reach Bass's residence.

4

Hopson, when Bass exited his home, his hands were wet and sudsy as though he had just washed them. Captain James Smith, who also responded to the dispatch about the shooting, testified that he performed a gunshot-residue test on Bass. The forensic scientist who analyzed the test results stated that, although thoroughly washing one's hands can remove gunshot residue, the test performed on Bass showed Bass still had particles indicative of gunshot residue on both his hands. The forensic scientist further stated that no gunshot residue was found on Jackson's hands. Emergency responders did, however, discover a .32-caliber handgun in Jackson's pocket after the shooting. The emergency responder who found the weapon testified that Jackson was wearing two pairs of pants and that the gun was tucked into the front right pocket of Jackson's inner pair of pants.

¶10. Captain Smith testified that he also collected evidence from the crime scene. Captain Smith stated that he found four .380-caliber shells in the front yard of the home on Cotton Street where the shooting occurred. He also found one nine-millimeter shell casing in the middle of the road.

¶11. After being taken into custody, Bass gave a recorded statement to law-enforcement officers. Investigator James Clark testified that Bass voluntarily waived his *Miranda*[3] rights and spoke to both him and Captain Rico Harris. The State called Investigator Clark as a rebuttal witness to testify about the differences between Bass's pretrial statement and his trial testimony. Investigator Clark stated that, during their interview, Bass claimed Jackson pulled

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

out a gun and shot at him twice. Bass then told the officers that he pulled out his own gun, which he had brought with him, and shot back at Jackson once or twice. Unlike during his trial testimony, Bass denied during the pretrial interview that Small gave him the gun. In fact, Investigator Clark testified Bass said Small had nothing to do with the gun. Bass instead told the officers that he had bought the gun from a man for $100 and that he kept the weapon under his mattress.

¶12.    After considering all the evidence and testimony, the jury found Bass guilty of first-degree murder with a firearm enhancement. Prior to sentencing, Bass filed multiple motions, including a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial; a motion for sentencing pursuant to *Miller*; and motions seeking expert-assistance funds for a psychologist and a mitigation investigator. The circuit court granted Bass's request for funds for a psychologist but denied the requested funds for a mitigation investigator. The circuit court also denied Bass's motion for a JNOV or, in the alternative, a new trial. After considering the evidence presented at Bass's sentencing hearing, the circuit court sentenced Bass to LWOP for first-degree murder and to a consecutive five-year sentence for the firearm enhancement, with both sentences to be served in MDOC's custody.

¶13.    Aggrieved, Bass appeals.

## DISCUSSION

### I.    Right against Self-Incrimination

¶14.    For the first time on appeal, Bass contends that law-enforcement officers violated his

6

right against self-incrimination. Specifically, Bass asserts that, because he was only seventeen years old at the time of the crime, Investigator Clark and Captain Harris should never have accepted his *Miranda*-rights waiver or questioned him without permission from a parent or guardian. Because Bass never raised this objection before the circuit court, he is procedurally barred from doing so now. *See Morton v. State*, 246 So. 3d 895, 899 (¶35) (Miss. Ct. App. 2017). Notwithstanding the procedural bar, we find Bass's argument lacks merit.

¶15. The Mississippi Supreme Court has previously held "that minors can be treated as adults in such circumstances and are allowed to waive their rights and confess to a crime." *Eskridge v. State*, 765 So. 2d 508, 511 (¶16) (Miss. 2000) (citing *Clemons v. State*, 733 So. 2d 266, 269 (¶¶8-12) (Miss. 1999)); *see also Woodham v. State*, 779 So. 2d 158, 162 (¶19) (Miss. 2001) (finding under the totality of the circumstances that a sixteen-year-old's confession was admissible, even without an attorney present at the time he confessed, because the record indicated the defendant understood both his right against self-incrimination and the consequences of waiving the right). In *Clemons*, a fourteen-year-old boy confessed to fatally shooting several people. *Clemons*, 733 So. 2d at 268 (¶5). On appeal, Clemons argued "that, because neither of his parents were present during his interrogation, his understanding of his rights was diminished and the interrogation was coercive." *Id.* at 269 (¶13). However, the supreme court affirmed the admissibility of the confession and held Clemons was not entitled to have a parent present during his

7

interrogation. *Id.* at 269-70 (¶¶13-14).

¶16. In the present case, the State called Investigator Clark to testify on rebuttal about the discrepancies between Bass's pretrial statement and his trial testimony. Under a belief that the State planned to admit into evidence part of Bass's recorded interview, the defense asked the circuit court to restrict the admission to those interview portions that specifically rebutted Bass's trial testimony. The State informed the circuit court, however, that it only planned to have Investigator Clark testify about the interview and had no intention to introduce the actual recording into evidence. The defense raised no objections.

¶17. According to Investigator Clark, he and Captain Harris explained the *Miranda* rights to Bass, and Bass indicated he understood his rights before voluntarily waiving them. Investigator Clark further stated on cross-examination that Bass did not appear to be in an excited state of mind at the time he waived his *Miranda* rights and gave his statement. Bass himself confirmed during his testimony that Investigator Clark and Captain Harris explained his *Miranda* rights to him and that he still wanted to give a statement about the shooting. Therefore, based on our review of the evidence and relevant caselaw, we find no merit to Bass's assignment of error.

## II. Motion for Mistrial

¶18. Bass argues the circuit court erred by failing to grant a mistrial. First, Bass asserts the circuit court should have granted a mistrial due to media coverage of the trial. Second, Bass contends the circuit court erred by not declaring a mistrial after learning the jury may have

been "contaminated by a person entering the jury room [who] was not a member of the empaneled jury . . . ." We review the circuit court's denial of Bass's motion for a mistrial for abuse of discretion. *See Williams v. State*, 240 So. 3d 436, 443 (¶15) (Miss. Ct. App. 2017). "The trial court must declare a mistrial when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Id.* (quoting *Rayner v. State*, 186 So. 3d 881, 893 (¶49) (Miss. Ct. App. 2015)).

¶19. Prior to opening statements, Bass's attorney informed the circuit court that the "case and some of the alleged facts . . . were covered fairly heavily on the Memphis[-]area news this morning." The defense did not move for a mistrial but asked the circuit court to inquire whether the jurors had seen or heard anything about the case in the media. The defense further requested that the circuit court instruct the jurors to refrain from watching the news during the trial.

¶20. Just minutes later, the circuit court informed the trial attorneys that a non-juror had entered the jury room. The circuit court explained that a member of the venire had failed to find out whether he had been selected for the jury and had instead shown up for the trial and entered the jury room. Upon learning this information, the defense moved for a mistrial on the basis of jury contamination. The circuit court noted that it was not particularly concerned about the incident because no proof had yet been presented in Bass's trial. The circuit court reserved its ruling, however, until after questioning the jurors.

¶21. Once the jurors entered the courtroom, the circuit court inquired whether they had

9

seen the Memphis-area media coverage of the trial. None of the jurors indicated they had seen the coverage. The circuit court then instructed the jurors to refrain from watching the news for the duration of the trial. Next, the circuit court asked whether the jurors had "any type of conversation at all or anything about this case or anything relating to this case" with the venire member not empaneled as a juror. Again, the jurors indicated they had not. Because the parties had not yet presented any evidence and the jurors indicated they had neither seen the media coverage nor spoken with the non-juror about the case, the circuit court denied the defense's motion for a mistrial.

¶22. The following day of trial, the defense renewed its motion for a mistrial on the ground there had been additional media coverage of the trial and that such coverage prejudiced Bass. Bass's attorney admitted, however, that he had no evidence any jurors had actually observed the media coverage. When the circuit court subsequently questioned the jurors about the additional media coverage, they all responded that they had not seen the news. As a result, the circuit court again denied the defense's mistrial motion.

¶23. "[W]henever there is a question of outside influencing of a jury, the trial judge himself ought to examine the jury carefully to ensure that the jury's deliberations are based on the evidence produced at trial and not extraneous matters." *Wells v. State*, 698 So. 2d 497, 505 (Miss. 1997). As the record reflects, several times throughout the trial the circuit court questioned the jury to determine if it had been affected by any outside influences. At the time of the defense's first mistrial motion on the basis of jury contamination, the circuit court

correctly noted that no proof had yet been presented in the case and that all the jurors indicated they had not spoken to the non-juror about case-related matters. In addition, both times the circuit court questioned the jurors about whether they had seen the media coverage of the trial, they indicated they had not.

¶24. "We must assume that jurors answer truthfully when polled, else the entire polling procedure is rendered pointless." *Id.* Based on our review of relevant caselaw and the trial transcript, we find the circuit court's actions in questioning the jury and reminding them to avoid watching the news sufficiently ensured that Bass received a fair and impartial trial not contaminated by outside influences. We therefore find no abuse of discretion in the circuit court's denial of the defense's motion for a mistrial.

### III. Jackson's Criminal History

¶25. Bass also contends for the first time on appeal that the State violated his constitutional rights by failing to provide him with Jackson's juvenile record. Because Bass never raised this issue before the circuit court, his argument is procedurally barred. *See Britton v. State*, 241 So. 3d 639, 645 (¶22) (Miss. Ct. App. 2018). Notwithstanding the procedural bar, we find no evidence to show that the defense ever requested Jackson's juvenile record or that the State in any way suppressed such a document. Further, even had the defense sought and obtained Jackson's juvenile record, Bass raises no admissible purpose for the record's introduction. *See* M.R.E. 404 (discussing the admissible purposes for the introduction of evidence of a victim's character or prior bad acts). Without providing further detail or

11

reasoning, Bass simply asserts the outcome of his trial may have been different had the jury been presented with evidence of Jackson's criminal history. Upon review, we find Bass's argument fails to overcome the procedural bar and lacks merit.

### IV. Prosecutorial Misconduct

¶26. Bass further claims the State committed several incidences of prosecutorial misconduct. According to Bass, a majority of the State's witnesses presented perjured testimony. Bass claims that law-enforcement officers knowingly used this false testimony to arrest him and that the State knowingly presented the testimony at trial. In addition, Bass asserts the State withheld from him that it paid the forensic pathologist for his expert trial testimony.

¶27. Not only did Bass's trial attorney thoroughly cross-examine each of the State's witnesses, but the defense never raised these objections before the circuit court. *See Britton*, 241 So. 3d at 645 (¶22). Furthermore, Bass has failed on appeal to direct this Court to any record evidence or relevant legal authority that supports his claims. *See* M.R.A.P. 28(a)(7) (providing that an appellant's brief must contain the appellant's contentions "with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on"); *Satterfield v. State*, 158 So. 3d 380, 383 (¶6) (Miss. Ct. App. 2015) (finding that an appellant's failure to affirmatively demonstrate error in the trial court waives the issue on appeal). As a result, we find these arguments are procedurally barred.

12

### V. Weight of the Evidence

¶28. Bass argues the jury's verdict was against the overwhelming weight of the evidence because the State failed to prove he had the "deliberate design" necessary for first-degree murder. When reviewing a challenge to the weight of the evidence, this Court views the evidence in the light most favorable to the verdict. *Hall v. State*, 245 So. 3d 396, 403 (¶30) (Miss. 2018). We will only reverse where the verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* Where conflicts arise in the evidence, the jury acts as the sole judge of witnesses' credibility and determines "the weight and worth of their testimony." *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2017).

¶29. The jury convicted Bass under section 97-3-19(1)(a), which defines first-degree murder as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being . . . ." Thus, the State was required to prove Bass: (1) killed Jackson; (2) without authority of law; and (3) with deliberate design to effect Jackson's death. *See Hall*, 245 So. 3d at 402 (¶22). In previously discussing deliberate design, this Court stated:

> A person can quickly form the deliberate design to kill a person; perhaps only moments before the act. Deliberate design may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury. Furthermore, intent may be proven by showing the acts of the person involved at the time, and the circumstances surrounding the incident. Ultimately, intent is a question of fact gleaned by the jury.

13

*Crump v. State*, 237 So. 3d 808, 819 (¶37) (Miss. Ct. App. 2017) (citations and internal quotation marks omitted).

¶30.    Despite Bass's contentions, the State presented evidence from which a jury could conclude that Bass acted with deliberate design to effect Jackson's death. The jury heard testimony that, shortly before the shooting, Bass attempted to hit Jackson with his car and then announced that he was going to kill Jackson. Although witness testimony varied as to how Bass obtained the gun he used, seven of the State's witnesses stated they watched Bass shoot Jackson in the back of the head. Multiple witnesses further testified they never saw Jackson with a gun and that he was actually trying to run away when Bass shot him. In addition, one of the State's witness testified that, as Bass ran past her after the shooting, he said, "I hope I killed that bitch."

¶31.    As demonstrated by its verdict, the jury clearly accepted the State's evidence and the version of events presented by the State's witnesses. Viewing the evidence in the light most favorable to the verdict, we cannot say that upholding Bass's conviction fails to sanction an unconscionable injustice. *See Hall*, 245 So. 3d at 403 (¶30). We therefore find this assignment of error lacks merit.

### VI.    Expert Funding for Mitigation Investigation

¶32.    Prior to his sentencing hearing, Bass sought expert funding for a mitigation investigator and a psychologist. The circuit court granted the funding for a psychologist but denied it for a mitigation investigator. On appeal, Bass argues the circuit court's decision

14

prevented him from presenting all aspects of his defense during sentencing. Bass further contends the circuit court erred because he was entitled to the same expert assistance during sentencing as a defendant facing the death penalty in a capital-murder case. "Whether an indigent defendant must be provided expert funding is decided on a case-by-case basis, and we review this issue for an abuse of discretion." *Barnett v. State*, 192 So. 3d 1033, 1038 (¶17) (Miss. Ct. App. 2015) (quoting *Barksdale v. State*, 176 So. 3d 108, 111-12 (¶18) (Miss. Ct. App. 2015)).

¶33. Our caselaw recognizes the responsibility States bear to ensure defendants receive a fair opportunity to present their defense, including receiving expert assistance when the denial of such assistance would render a trial fundamentally unfair. *Barksdale*, 176 So. 3d at 111-12 (¶18). Even so, courts are not required to provide an expert every time an indigent defendant requests one. *Id.* at 112 (¶18). "Rather, an indigent's right to defense expenses is conditioned upon a showing that such expenses are needed to prepare and present an adequate defense." *Barnett*, 192 So. 3d at 1039 (¶18) (internal quotation marks omitted). Defendants must establish a substantial need for expert assistance and provide concrete reasons for requiring an expert. *Id.*

¶34. Even in relation to a capital-murder case, the supreme court has upheld the denial of expert assistance where the defendant failed to show the necessity for such funding. *Crawford v. State*, 218 So. 3d 1142, 1153 (¶¶26-27) (Miss. 2016). In *Crawford*, the defendant argued in a successive postconviction relief (PCR) petition that his first PCR

15

attorney failed to obtain needed expert assistance. *Id.* at 1146-47 (¶2). Crawford's first PCR attorney requested that the trial court grant expert funding for a mitigation investigator to thoroughly investigate evidence that should have been presented at the sentencing phase of Crawford's death-penalty case. *Id.* at 1152 (¶22). After the trial court denied the requested funding, Crawford's first PCR attorney filed a petition for an interlocutory appeal with the supreme court. *Id.* at 1153 (¶26). A three-justice panel denied the petition after concluding "that Crawford had failed to show that the appointment of a mitigation investigator . . . was necessary." *Id.*

¶35. In the present case, the circuit court noted in its denial of Bass's requested funding for a mitigation investigator that all the caselaw Bass provided involved situations where a jury was "asked to make difficult decisions [on] . . . issues that perhaps the jury is unfamiliar." By contrast, the circuit court stated that "[n]o jury [would] be involved in determining the instant question." The circuit court further stated that it was quite familiar with the factors to be analyzed at Bass's *Miller* hearing.

¶36. The circuit court also addressed the claim made by Bass's trial attorney that the defense required a social-history investigation "and that lawyers are trained in the law, not in conducting social histories." The circuit court pointed out that attorneys conduct investigations in all their cases as they sort through the facts and then present those facts to the jury. The circuit court also stated it was "not persuaded that attorneys are so confined in their intellect, experience[,] and training that they are incapable of researching and reviewing

16

the personal history of a defendant, determining what is pertinent and material to the issue . . . [,] and presenting such evidence to the court." For these reasons, the circuit court concluded funding for a mitigation investigator was unnecessary.

¶37. Upon review, we find the circuit court's denial of expert funds for a mitigation investigator neither deprived Bass of the opportunity to present his defense during sentencing nor rendered his sentencing hearing fundamentally unfair. After thoroughly considering both Bass's requests for expert funding, the circuit court determined Bass established a substantial need for a psychologist but not for a mitigation investigator. Because we find no abuse of discretion in the circuit court's decision, we conclude this issue lacks merit.

## VII. Jury Sentencing

¶38. According to Bass, the circuit court's imposition of his sentence violated his constitutional right to have a jury determine his sentence. In several recent opinions, however, this Court rejected the argument that a defendant has a constitutional right to a jury sentencing at a hearing conducted under the *Miller* guidelines. *Jones v. State*, No. 2015-KA-00899-COA, 2017 WL 6387457, at *4 (Miss. Ct. App. Dec. 14, 2017) (recognizing that no constitutional right exists to a jury sentencing in a *Miller* hearing); *Cook v. State*, 242 So. 3d 865, 876 (¶39) (Miss. Ct. App. 2017) (same); *Davis v. State*, 234 So. 3d 440, 442 (¶10) (Miss. Ct. App. 2017) ("Our state Supreme Court post-*Miller* has treated life without parole as a sentencing option and the trial judge as an appropriate sentencing authority.").

¶39. In *Wharton v. State*, No. 2017-CA-00441, 2018 WL 4708220, at *6-*7 (Miss. Ct.

17

App. Oct. 2, 2018), while once again holding that no **constitutional** right to a jury sentencing in a *Miller* hearing exists, we recognized that a **statutory** right to such sentencing sometimes exists. "To determine the sentencing authority in a *Miller* hearing, we look to the statute under which the juvenile offender was convicted and sentenced, until and unless the Legislature prescribes otherwise." *Id.* at *7. The juvenile defendant in *Wharton* was convicted of capital murder under Mississippi Code Annotated section 99-19-101 (Rev. 1994). *Id.* at *4. With regard to sentencing under this statute, we explained:

> Specifically, under section 99-19-101's sentencing scheme, the Legislature has vested sentencing authority in the jury, and that authority only allows a sentencing proceeding to be conducted before a trial judge without a jury if the right to a jury was waived or the defendant [pled] guilty, as follows:
>
> > If the trial jury has been waived, or if the defendant [pled] guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing.

*Wharton*, 2018 WL 4708220, at *4. Because Wharton neither waived his right to a jury sentencing nor pled guilty, we acknowledged that, at his resentencing pursuant to the *Miller* guidelines, he had a statutory right to be resentenced by a jury rather than the trial judge. *Id.*

¶40. Unlike in *Wharton*, Bass was not convicted and sentenced under a statute that specifically vests sentencing authority solely with the jury. After the jury found Bass guilty of first-degree murder, the circuit court sentenced him under Mississippi Code Annotated section 97-3-21(1) (Rev. 2014), which provides that "[e]very person who shall be convicted of first-degree murder shall be sentenced by **the court** to imprisonment for life in the custody

18

of [MDOC]." (Emphasis added). Because section 97-3-21(1) explicitly vests sentencing authority with the court, Bass possesses no statutory right to a jury sentencing. And as previously discussed, our recent decisions clearly refute his claim of a constitutional right to a jury sentencing at his *Miller* hearing. We therefore find Bass's argument regarding this issue lacks merit.

### VIII. Sentence of LWOP

¶41. Bass's appellate attorney argues on appeal that the circuit court erred by sentencing Bass to LWOP and that this Court should vacate Bass's sentence so he can be resentenced to life with eligibility for parole. Specifically, Bass's attorney asserts that the circuit court failed (1) to give proper weight to the expert opinion of Dr. Criss Lott, the clinical and forensic psychologist who provided a report for Bass's sentencing hearing, and (2) to properly consider and discuss all the *Miller* factors. In his supplemental pro se brief, Bass challenges the legality of his sentence. For the sake of brevity, we address these arguments together under one assignment of error.

¶42. Our supreme court recently rejected the argument that heightened scrutiny should apply to a review of a trial court's sentencing decision under *Miller*. Instead, the supreme court stated:

> Heightened scrutiny is reserved for death-penalty cases due to the unique and irreversible nature of that punishment. The Court has no reasonable basis to raise its standard of review for a sentence in a noncapital case simply because it involves a juvenile offender. Accordingly, we hold that there are two applicable standards of review in a *Miller* case. First, whether the trial court applied the correct legal standard is a question of law subject to

19

de novo review. If the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion.

*Chandler v. State*, 242 So. 3d 65, 68 (¶7) (Miss. 2018) (citations omitted).

¶43. With regard to sentencing hearings for juvenile homicide offenders, "*Miller* does not prohibit sentences of life without parole . . . . Rather, it 'requires the sentencing authority to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Parker v. State*, 119 So. 3d 987, 995 (¶19) (Miss. 2013) (quoting *Miller*, 567 U.S. at 480)). *Miller* identified several factors the sentencing authority must consider before sentencing a juvenile homicide offender to LWOP. *Miller*, 567 U.S. at 477-78. These factors include the following: (1) an offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds [the offender]—and from which he cannot usually extricate himself"; (3) "the circumstances of the homicide offense, including the extent of [the offender's] participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether the offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors . . . or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation . . . ." *Id.* Where a "judge determines that *Miller* does not mandate parole eligibility, then the judge must deny relief because the Legislature has provided by law that persons convicted of murder are not eligible for parole." *Cook*, 242 So. 3d at 873-74 (¶27)

(citing Miss. Code Ann. § 47-7-3(1)(f) (Rev. 2015)).

¶44. In the present case, the circuit court stated that, prior to reaching a decision, it carefully considered the witnesses' testimony and carefully reviewed Dr. Lott's twenty-seven-page report on the factors relevant to determining an appropriate sentence for a juvenile homicide offender. In sentencing Bass to LWOP, the circuit court addressed the *Miller* factors. As to chronological age, the circuit court noted that Bass was only about seventy days from his eighteenth birthday when he shot Jackson. The circuit court further noted that, prior to shooting Jackson, Bass had already compiled an extensive youth-court record between the ages of 11 and 17 and had previously used deadly weapons to commit crimes. In addition, the circuit court found that Bass's actions toward Jackson immediately prior to the shooting demonstrated a lack of impetuosity (a hallmark feature of the current *Miller* factor). Specifically, the circuit court stated that the threats Bass made to Jackson prior to the shooting displayed premeditation and/or an intention to kill Jackson. Based on these findings, the circuit court concluded Bass's chronological age weighed against granting parole eligibility under *Miller*.

¶45. As to Bass's family and home environment, the circuit court recognized that Bass's family and personal lives were regularly in a state of chaos, that Bass lacked a male role model, and that the lack of contact with his father affected Bass. The circuit court also found, however, that Bass had denied using drugs or alcohol and that Dr. Lott's report failed to provide a significant psychiatric history on Bass or to identify any particular incidents that

21

significantly negatively impacted Bass's life. The circuit court determined Bass's family and home environment, especially the apparent lack of discipline in Bass's upbringing, weighed partially in favor of parole eligibility.

¶46. In considering the circumstances of Jackson's murder, the circuit court concluded this factor weighed against parole eligibility. Although testimony varied as to where Bass obtained the gun he used to shoot Jackson, witnesses repeatedly testified that Bass was the shooter and that he shot Jackson in the back of the head. The circuit court also discussed Bass's conduct toward Jackson immediately before the shooting, which included evidence that Bass tried to hit Jackson with his car and then verbally threatened to kill Jackson before shooting him. In addition, witnesses stated that Jackson was unarmed and was attempting to run away when Bass shot him. Based on the circumstances of the homicide, the circuit court found that Bass's actions displayed premeditation and/or an intention to kill Jackson.

¶47. Finally, with regard to the possibility of rehabilitation, the circuit court stated that Bass's youth-court record failed to provide "any positive factors" or "any real substantial hope of rehabilitation." The circuit court noted that Bass's youth-court record detailed the commission of progressively more serious and violent crimes, including those involving the exhibition and/or use of a deadly weapon. The circuit court further noted that this progression culminated with Bass shooting Jackson in the back of the head. The circuit court concluded the evidence "paint[ed] a picture of an individual with little or no regard for the value of human life or general decency among his fellow man" and "with little, if any,

possibility of rehabilitation." The circuit court therefore found this factor also weighed against parole eligibility.

¶48. The circuit court did not directly discuss on the record whether Bass might have been charged and convicted of a lesser offense. However, the circuit court specifically provided that it conducted Bass's hearing and determined his sentence pursuant to *Miller*. Furthermore, in concluding its bench ruling, the circuit court stated that it was sentencing Bass to LWOP after considering **all the factors**, Dr. Lott's assessment, the witnesses' testimony, and the evidence presented. *See Jones*, 2017 WL 6387457, at *7 (recognizing that, while the circuit court did not specifically discuss each *Miller* factor on the record, "[n]either the United States Supreme Court nor the Mississippi Supreme Court has held that reversal is required just because the sentencing judge omits some factors from his on-the-record discussion of the reasons for the sentence").

¶49. Upon review, we find the circuit court conducted a hearing as required by *Miller* and only sentenced Bass to LWOP after applying every factor outlined in *Miller*. As a result, we conclude the circuit court applied the correct legal standard. In addition, we cannot say the circuit court abused its discretion by sentencing Bass to LWOP. Both the circuit court's bench ruling and its sentencing judgment sufficiently explained the court's reasoning for Bass's sentence, and substantial evidence supported the circuit court's findings. We therefore find Bass's assertions regarding this assignment of error lack merit.

**CONCLUSION**

23

¶50. Because we find no error in Bass's first-degree murder conviction and sentence of life without eligibility for parole, we affirm.

¶51. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**